IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK                                              PLAINTIFF

VS.                    NO. 4:15-CV-228 BRW

BRUCE PENNINGTON, ET. AL.,                                    DEFENDANTS

EXHIBIT NO. 6
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

EXCERPTS FROM DEPOSITION
OF DR. ROGER TROXEL

```
 1   there at that time?
 2   A.   I recall by face.  I don't recall actually the
 3   names, because, like I said, I worked with the people
 4   in medical, number one.  Number two, I'm awful with
 5   names.  I don't know your name unless I look at your
 6   chart.  That's why I'm looking right here to get
 7   Mr. Cook's name.  But I did speak to persons of
 8   authority, not the sheriff, you know.  So whether it
 9   was a lieutenant, a sergeant, a major, a general, I
10   don't know.
11   Q.   Okay.  But it was --
12   A.   He was a burly fellow.
13   Q.   Okay.  Does Sergeant Mike Richards sound
14   familiar?
15   A.   Once again, I don't know them by name.  I know
16   them by --
17   Q.   Did he have stripes on his --
18   A.   He was wearing street clothes.
19   Q.   Street clothes, okay.  What did you tell the
20   persons of authority that you talked about?
21   A.   I told them that this inmate had a prolapsed
22   rectum, that this was a medical situation that was
23   beyond the scope of care that Advanced Correctional
24   would deliver in the jail setting, that this condition
25   would be something that would need to be addressed, and
```

```
 1   my recommendation at that point was -- and I do recall
 2   this specifically -- was for the patient to go to UAMS.
 3           And the reason I stated UAMS was my opinion at
 4   the time -- and this is opinion only -- would be that
 5   if he had gone to the local emergency room in Benton
 6   that that physician would probably have had no more
 7   experience than I at dealing with a situation like this
 8   and would have probably just transferred the patient on
 9   to UAMS.
10           And so in my opinion, there was no reason to
11   bring in another party, get him directly to a facility
12   with residents and surgeons in either GI or surgery
13   that could come down to the emergency department and
14   fix it.
15   Q.   Okay.  Let me make sure I'm -- you and I are on
16   the same page, and I understand your narrative response
17   there.
18           First of all, did you specifically tell whichever
19   head honcho or person in the head honcho room that you
20   talked to -- did you specifically tell him that
21   Mr. Cook had a prolapsed rectum?
22   A.   Yes.
23   Q.   Did you give any sort of description of the
24   prolapsed rectum to the head honcho?
25   A.   I didn't actually give a description, but I'm
```

```
 1   sure he would have been able to have viewed it himself.
 2   Q.    Okay.  And I believe you said that a prolapsed
 3   colon was beyond what care you could provide at the
 4   jail.  Is that correct?
 5   A.    Similar to as if a person was having a heart
 6   attack.  We wouldn't be able to put a stent in there.
 7   So basically it was more than -- it was more than what
 8   we could -- it was care more advanced than what was
 9   capable of being delivered in the jail, yes.
10   Q.    Okay.  Could -- had you chosen to do so, would it
11   have been possible at the jail to push the rectum back
12   inside the anus?
13   A.    That would be a situation that I would not
14   undertake because I'm not going to let the first
15   patient I've ever tried that on be -- I'm going to make
16   sure I have -- you know, see one, teach one, do one,
17   you know, or see one, do one, teach one.  I'm going to
18   make sure I have seen that procedure done before I
19   attempt to do that procedure myself, and I had never
20   witnessed that procedure being done.  Therefore, I
21   would not do the procedure.
22   Q.    Okay.  Would it be true to say that it would pose
23   a risk to Mr. Cook for you to attempt reinsertion
24   without having seen the procedure yourself and done
25   what you have just talked about, see one, do one --
```

```
 1   A.    Teach one.
 2   Q.    -- teach one?
 3   A.    I would assume that that is a true statement.
 4   Q.    Okay.  And you made, I believe you said, the
 5   specific recommendation that the patient be taken to
 6   UAMS?
 7   A.    The specific recommendation was that the patient
 8   be sent to another facility.  The UAMS was more of an
 9   opinion based on just my knowledge of what goes on in
10   local ERs.
11   Q.    Okay.  But did you mention to whoever you talked
12   to in the jail that he needed to go -- or that you
13   recommended that he go to UAMS?
14   A.    I stated basically in essence that he did need to
15   go to another facility, and my recommendation was UAMS.
16   Q.    Okay.
17   A.    Once again, that's the private doctor in me.  The
18   private doctor in me is this patient, certainly if he
19   were in my office, I would want this problem rectified
20   as quickly as possible.  There may be extenuating
21   circumstances that I'm not privy to, that I'm not aware
22   of and really have no business being aware of that
23   could preclude that from having taken place.
24   Q.    Okay.  Did -- at that point, what did you do?
25   A.    Discussed the case with the nurses, did discuss
```

```
 1           IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
 2                     WESTERN DIVISION
   ─────────────────────────────────────────────────────
 3
   STEVEN DAVID COOK,
 4
                    Plaintiff,
 5
                                       Case No. 4:15CV228-BRW
   Vs.
 6
   BRUCE PENNINGTON, Individually, and in his official
 7 capacity as Sheriff of Saline County, Arkansas; LT. DON
   BIRDSONG, Individually, and in his official capacity as
 8 the Administrator of the Saline County Detention Center;
   ROGER L. TROXEL, M.D., Individually, and in his official
 9 capacity as a policy-maker and health care provider for
   Advanced Correctional Healthcare, Inc.; ANDY GILL,
10 Individually; ADVANCED CORRECTIONAL HEALTHCARE, INC.;
   SALINE COUNTY, ARKANSAS; DEPUTY LAUREN FURR,
11 Individually; SGT (1st name unknown) RICHARDS,
   Individually; DEPUTY RYAN MCKINNEY, Individually; and
12 LPN GLENN SONK, Individually,

13                    Defendants.
   ─────────────────────────────────────────────────────
14
            THE VIDEOTAPED DEPOSITION OF ROGER TROXEL, M.D.
15                        December 18, 2015

16

17                                              ORIGINAL

18

19

20

21

22
                        ACP REPORTING, INC.
23              Certified in Tennessee and Arkansas
                     1615 North Division Street
24                      Forrest City, AR  72335
                           (870)295-1235
25                       annereporter@aol.com
```

```
 1   A.   Yes, I am familiar with the document.
 2   Q.   All right.  We're going to mark this as
 3   defense -- or excuse me -- as Exhibit Number 1 to your
 4   deposition.
 5             (Exhibit 1 was marked.)
 6   BY MR. ADCOCK:
 7   Q.   Tell us what Exhibit Number 1 is, please, Doctor.
 8   A.   This is a medical progress note written by Nurse
 9   Sonk on July 6th, 2012, has a summary of the events, to
10   his recollection, of Mr. Cook.  Correct?
11   Q.   Yes.
12   A.   Of Mr. Cook's situation from June 29 of '12
13   through July 6 of 2012 when the note was written.
14   Q.   Okay.
15   A.   It's essentially -- I'm sorry.  Let me qualify
16   that.  It's essentially from July -- I'm sorry --
17   June 29th through July 2nd, 2012.
18   Q.   Okay.  My understanding is that Mr. Cook, my
19   client, had a prolapsed colon when he -- at some point
20   that developed when he was inside the Saline County
21   Detention Center as an inmate on June 29th of 2012.  Is
22   that correct?
23   A.   The rectum is part of the colon anatomically.  So
24   it was -- I would actually refer to it more as a
25   prolapsed rectum because it was the very distal part or
```

1   the very end part of the GI tract that was protruded.
2   So more correctly I would call it as a rectal prolapse.
3   Q.    Okay. What is the difference between a rectal
4   prolapse and a prolapsed colon, because I have seen the
5   phrase "prolapsed colon" in a couple of the medical
6   records?
7   A.    I'm certainly not a -- an expert in GI anatomy.
8   However, the rectum is part of the colon. So in other
9   words, when you undergo a colonoscopy, the colonoscope
10  is inserted, and it examines the rectum and all of the
11  parts of the colon. So it's essentially Coke versus
12  Pepsi.
13  Q.    Okay. The thing that I got out of that was that
14  the rectum is actually a part of the larger organ
15  called the colon. Would that be correct?
16  A.    In my training, yes, that would be correct.
17  Q.    Okay. And it was -- the rectum is the portion of
18  that organ that is closest to the anus. Would that be
19  correct?
20  A.    Yes.
21  Q.    And it was the rectum that was protruding on
22  June 29th of 2012 when you came to see Mr. Cook. Is
23  that right?
24  A.    That is correct.
25  Q.    All right. Looking at this document, Exhibit 1

1  the cell where Mr. Cook was being kept, you would not
2  have any reason to doubt that, would you?
3  A.     Not at all.
4  Q.     Okay.  Do you -- what did you do or -- strike
5  that.
6         Did you observe the rectal prolapse?
7  A.     Yes.
8  Q.     Approximately how much of the rectum was
9  prolapsed?
10 A.     The rectum prolapse was approximately the size of
11 my hands.
12 Q.     You're holding both of your hands out.
13 A.     It appeared to be as it was in the shape almost
14 of a bowl.  So I would say bigger than an ice cream
15 bowl, probably the size of a cereal bowl in your
16 kitchen.
17 Q.     Okay.
18 A.     It essentially is going to come out in almost
19 layers, kind of like ice cream.  It was not -- in other
20 words, the rectum was not that wide.  It just sort
21 of -- well, it's called redundant anatomy.  So it was
22 just basically a mass of tissue about that size, about
23 the size of a bowl.
24 Q.     Okay.  You were holding your hands together when
25 you did that, and when I look at my hands together like

```
 1   that, it would appear that the prolapse was a good six
 2   to seven inches wide.  Would that be true?
 3   A.    Yes.
 4   Q.    Okay.  And I am assuming that the more of the
 5   rectum that actually protrudes, the larger the prolapse
 6   will get -- would that be true -- at least up to a
 7   point?
 8   A.    That would depend upon the clinical situation
 9   because there are other things that would limit how
10   much of the inside can actually go outside.  Most cases
11   of rectal prolapse are chronic conditions where the
12   patient can prolapse it and reinsert it.
13   Q.    Okay.
14   A.    And there are limiting factors like the anatomy
15   itself.
16   Q.    Okay.  Now, we have established that it was six
17   to seven inches wide.
18   A.    Yes.
19   Q.    How far from the anus was the tip of the
20   prolapse?  How far had it come outside the body as best
21   you can recall?
22   A.    The best way I could describe this, it's like
23   taking off your sock, and so when you take off your
24   sock and it is in kind of a wad on the floor, you
25   really don't know where the toe is or really don't know
```

1  often this has occurred, if this was an initial
2  occurrence or a repeat occurrence.  There are multiple
3  factors that -- each patient is individual.
4  Q.    Okay.  Based upon what you know today, can you
5  tell us what were the clinical circumstances of
6  Mr. Cook at that point?
7  A.    Mr. Cook had a rectal prolapse.  The rectal
8  prolapse is what I would consider a medical situation
9  that I certainly wouldn't want to have.  I would
10 certainly not want to have a rectal prolapse, and if I
11 had a rectal prolapse, I would want that situation
12 rectified as quickly and efficiently as possible.
13 Q.    Okay.
14 A.    However, I do not feel that the patient was in
15 any immediate distress.  He wasn't going to die from
16 this situation.  He was not going to -- it was a
17 situation that warranted being addressed.
18 Q.    Okay.  You indicated at one point during that
19 last response that I certainly would not want to have
20 it.  Can you tell me why that's true?
21 A.    Certainly.  It would be a situation -- if I have
22 a patient come into my office and they have this
23 situation, obviously they are coming to me because
24 something is wrong, something is not normal, and they
25 want it fixed.

```
 1   the case with the sheriff, stated -- the sheriff
 2   actually was not there initially, but he came in during
 3   the conversation, spoke with the sheriff, and the
 4   sheriff voiced an agreement that, yes, he felt, as did
 5   I, that this would be the best case of action.
 6      Q.   Okay.  So after you told whoever was in the head
 7   honcho office originally, you did talk with Sheriff
 8   Bruce Pennington?
 9      A.   Yes.
10      Q.   And he came to what we have called the head
11   honcho office.  Is that right?
12      A.   Yes.
13      Q.   And did you repeat to Sheriff Pennington what you
14   just told me a few moments ago about how -- that he had
15   a prolapsed colon or prolapsed rectum, that this was
16   beyond what you could provide or for which you could
17   provide care in the jail setting and that you
18   recommended that he go to UAMS?
19      A.   I recommended, once again, he go to another
20   facility and suggested that UAMS would probably be the
21   best option in my opinion.
22      Q.   But the important thing from my perspective is
23   that you did tell Sheriff Pennington that this was
24   something that you could not deal with at the jail?
25      A.   Yes.
```

1  Q.    Okay. If he says that he thought it was
2  potentially life threatening to have a portion of his
3  body hanging out like that, would you have any way to
4  dispute that, that this is his honest belief?
5  A.    I really have no way of testifying as to what the
6  patient thought.
7  Q.    Okay. Thank you.
8  A.    You're welcome.
9  Q.    Now, what happened next after you talked to the
10 sheriff?
11 A.    There was an assumption that the sheriff had
12 agreed -- well, actually the sheriff had agreed that
13 the patient needed to be assessed at an outside
14 facility, and the assumption at the time of my leaving
15 the building was that the patient was going to be sent
16 to another facility for definitive care.
17 Q.    And you say the assumption at the time. Am I
18 correct in believing that that was your assumption?
19 A.    Yes, sir.
20 Q.    Okay. You thought that he would be sent directly
21 to another facility to actually deal with this problem?
22 A.    Directly or within a short amount of time, yes.
23 Q.    By -- what do you mean by "a short amount of
24 time"?
25 A.    I would assume that there would have to be