IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK                                              PLAINTIFF

VS.                    NO. 4:15-CV-228 BRW

BRUCE PENNINGTON, ET. AL.,                                     DEFENDANTS

EXHIBIT NO. 8
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

EXCERPTS FROM DEPOSITION
OF ANDREW GILL

ORIGINAL

```
                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
                           WESTERN DIVISION


STEVEN DAVID COOK
          Plaintiff

vs.                                    CASE NO. 4:15CV228-BRW

BRUCE PENNINGTON, LT., DON BIRDSONG, ROGER L. TROXEL,
M.D., ANDY GILL, ADVANCED CORRECTIONAL HEALTHCARE, INC.
SALINE COUNTY, ARKANSAS DEPUTY LAUREN FURR, SGT
RICHARDS, DEPUTY RYAN MCKINNEY AND LPN GLENN SONK
          Defendants


            ORAL DEPOSITION OF ANDREW GILL


APPEARANCES:

      MR. EDWARD ADCOCK, ESQ.
          1018 Cumberland, #11
          Little Rock, Arkansas  72202


              *** For the Plaintiff ***

      MS. CHRISTINE A. CRYER, ESQ.
      MR. T. J. FOWLER, ESQ.
          State of Arkansas Attorney General
          323 Center Street, Suite 200
          Little Rock, Arkansas  72201; and


      MR. GEORGE D. ELLIS, ESQ.
          Ellis Law Firm, P.A.
          126 North Main Street
          Benton, Arkansas  72015; and
```

```
 1   this, the way I got that is because that shows -- the
 2   Word file itself says it was created on that day.  I
 3   don't specifically remember.
 4   Q.   Sure.  I'm assuming that the fact that you thought
 5   Steven David Cook was planning to sue you was a matter
 6   of some urgency to you or some concern?
 7   A.   It caused me to feel like writing this down.
 8   Q.   And because you had enough concern to write this
 9   document, I'm sure you also had enough concern to make
10   sure to rack your memory and make sure that it was
11   correct, would you agree with that?
12   A.   No.
13   Q.   Okay.
14   A.   I can recall typing this out in a pretty quick
15   sitting and being done with it.  So I can't -- I
16   remember it kind of being almost an expression of
17   frustration.  It was sitting at the keyboard and
18   hammering something out because I had to get it out.
19   Q.   Okay. As you look over it today, is there
20   anything on the face of this document that you recognize
21   today as incorrect?
22   A.   Can I take a minute and look at it?
23   Q.   Of course.
24   A.   Okay.
25   Q.   You've now had an opportunity to look over Exhibit
```

1   Number 3.  To your knowledge, as you sit here today, is
2   everything in this exhibit true?
3   A.    To my knowledge, yes.
4   Q.    And, of course, you didn't purposefully fabricate
5   anything back when you wrote it on July 3, 2012; is that
6   correct?
7   A.    That's correct.
8   Q.    Now, it appears to me that there are two
9   paragraphs that are of importance to this lawsuit.  The
10  sixth paragraph down from the top of the page, let's
11  start with that.
12  A.    Okay.
13  Q.    It says, He was arrested, and that's talking about
14  Steven David Cook?
15  A.    Correct.
16  Q.    He was arrested on Friday the 29th.  And I'm
17  assuming by that you mean June 29th; is that correct?
18  A.    That's the way I would read it, yes.
19  Q.    And I was told by Stefany Cook that he had pushed
20  his colon out and was asking to be released.
21        Let's stop there.  Did Stefany call you and
22  volunteer that information?
23  A.    I believe so.
24  Q.    Did she go through an intermediary of any kind?
25  A.    I do not believe so.

```
1    A.    No.
2    Q.    Did you have any records from the jail?
3    A.    Not that I recall.
4    Q.    Okay.  At this point, do you know whether this
5    ever happened in the jail before Friday, June 29, 2012?
6    Do you have any independently verifiable fact that would
7    prove or establish that this had previously happened in
8    the jail?
9    A.    Not that I'm aware of.
10   Q.    Okay.  Do you have any proven or independently
11   verifiable fact, other than what Stefany Cook told you,
12   that this had ever happened anywhere?
13   A.    I've been told that there are medical records.  I
14   didn't know that at this time.
15   Q.    Okay.
16   A.    But now, that showed that this was a condition
17   that had occurred over a period of years.
18   Q.    I'm assuming you've heard that from your attorney
19   or whatever.  I don't want you to tell me what she told
20   you.  Okay.
21   A.    Okay.
22   Q.    Your communications with her are privileged.
23   A.    Sure.  I have not reviewed any medical records.
24   Q.    Okay.  Of your own personal knowledge, you have no
25   independently verifiable fact that would prove that
```

```
1   Steven David Cook had experienced a prolapsed colon
2   before Friday, June 29th of 2012; is that correct?
3   A.    Can you repeat that?
4   Q.    Of your own personal knowledge, do you have any
5   verifiable fact that would lead you to believe that
6   Steven David Cook had suffered a prolapsed colon, at any
7   time prior to Friday, June 29th of 2012?
8   A.    I don't believe so.
9   Q.    Okay.  Now, let's go to the next paragraph.
10  A.    Okay.
11  Q.    It says, I called the jail and was told that the
12  sheriff had said to release him due to his condition.
13  A.    Yes.
14  Q.    Okay.  Who did you talk to, and who told you that
15  the sheriff had intended to release Mr. Cook?
16  A.    Whoever answered the phone in booking.
17  Q.    Okay.  We know, based on Ryan McKinney's memo,
18  that Deputy Crystal McKinney is supposed to have
19  received a call from you on the 29th.  Do you recall
20  speaking with her?
21  A.    I don't recall who I spoke to.
22  Q.    Okay.  Do you recall whether it was a male or a
23  female?
24  A.    I do not.
25  Q.    Okay.  But, in any event, after you learned that
```

```
 1   the sheriff had said to release Mr. Cook, the next
 2   sentence in Exhibit 3 says, I called the sheriff and
 3   explained that it was my understanding that this is a
 4   long-term condition that the defendant can manipulate to
 5   get released.
 6         Do you remember when you called the sheriff, was
 7   it -- it was on that day, the 29th; is that right?
 8   A.    Yes.
 9   Q.    Okay.  And, at that point, did the sheriff tell
10   you that the jail doctor, a Dr. Troxel, had instructed
11   him to release the defendant to get medical treatment?
12   A.    I remember the conversation.  I don't remember --
13   I remember a few specifics from it.
14   Q.    Okay.
15   A.    I don't remember exactly what he said the
16   doctor -- all of what he said the doctor had said.
17   Q.    Okay.  Why don't you tell us specifically what you
18   can remember of the conversation with the sheriff right
19   now, everything you can specifically remember?
20   A.    Okay.  I --
21   Q.    In as much detail as you can remember it?
22   A.    I understand.  I'm qualifying this that it's three
23   and a half years ago.  I can recall the nature of the
24   conversation more than the specific words.
25   Q.    Let's start with the specific words that you can
```

1  remember, if you can any, and then we'll go to the
2  nature of the conversation. What can you remember in
3  specific detail that was said?
4  A.  I believe I remember him saying the doctor had
5  seen him. And the only thing I remember him saying
6  about what the doctor said was that the doctor hadn't
7  seen anything like it.
8  Q.  Okay.
9  A.  I think I agreed with him. I know this -- it's a
10 strange condition. It was not something that was --
11 Q.  You don't see it every day --
12 A.  No.
13 Q.  -- in the jail or anywhere else, for that matter?
14 A.  So I understand what -- it sounded consistent with
15 what Ms. Stefany had said. So I relayed to him my
16 understanding of his condition from Stefany.
17 Q.  Okay. Let's go to the next sentence then in
18 Exhibit Number 3.
19 A.  Correct.
20 Q.  It says -- and this is where you relayed to him
21 your concerns. It says, I also told him that I had
22 concerns about the safety of the victim in the case.
23     Is that right?
24 A.  Yes.
25 Q.  Okay. And were your concerns about the safety of

1  the victim due to the fact that the sheriff had
2  indicated to you that he was planning on releasing
3  Steven David Cook?
4  A.   Yes.  My recollection is that Stefany was
5  concerned, at this juncture in the case, because she
6  felt like he was going to know that she was aiding in
7  his prosecution.
8  Q.   Okay.
9  A.   And she had concerns that once he knew that, she
10 would be unsafe.
11 Q.   Okay.
12 A.   That's the way I remember it.
13 Q.   I understand.  Let me ask you one question about
14 that.  Did you recommend to the sheriff that he keep
15 Steven David Cook in jail?
16 A.   I asked him.
17 Q.   You asked him to; is that right?
18 A.   Correct.
19 Q.   Okay.  And did you ask him to keep Steven David
20 Cook in jail because you were concerned for Stefany's
21 well-being, or because Steven David Cook had a history
22 of the prolapsed colon?
23 A.   I don't understand.  That doesn't seem to be a
24 fair choice.  I don't understand your question.
25 Q.   Well, it seems to me that those are the only

```
 1   choices, whether they're fair or not.  It looks like
 2   you've got two potential reasons to keep Steven Cook.
 3   One is you think he's scamming the system, that he can
 4   protrude or extrude and whatever push back in the colon,
 5   and you don't want him to con the system to get out, or
 6   you're concerned about Stefany's well-being?
 7              MS. CRYER:  I'm going to object to the
 8         form, to the extent that it implies there
 9         would only be two reasons, and that he would
10         have to choose between the two.
11              MR. ADCOCK:  Those are the only two that
12         I can think of right now.
13              MS. CRYER:  Sure.
14   A.   I would also say that I don't think those are
15   mutually exclusive.
16   BY MR. ADCOCK (CONT.):
17   Q.   That's a fair answer.  Was your concern -- was
18   your request to keep Steven David Cook in jail, based,
19   at least in part, on your desire to protect Stefany?
20   A.   Yes.
21   Q.   Okay.
22   A.   I mean --
23   Q.   Go ahead.
24   A.   You go ahead.
25   Q.   Stefany had previously filed for an order of
```

```
 1   protection; is that right?
 2   A.   I'm not sure when she filed.
 3   Q.   Okay.
 4   A.   According to this document, this Exhibit 3, it
 5   says July 2nd.
 6   Q.   Okay.
 7   A.   Which would have been after this.
 8   Q.   You're right.
 9   A.   But I don't have an independent memory of that.
10   Q.   Okay.  Do you have -- as a prosecutor, do you have
11   any statutory authority to run the jail?
12   A.   No.
13   Q.   Okay. Running the jail is the exclusive
14   prerogative of the sheriff by statute; is that correct?
15   A.   I assume so.  I have not seen that statute, but
16   that's the way it seems to function.
17   Q.   I think that's the truth, but I don't have a
18   statute in front of me.
19        And Sheriff Pennington had indicated to you that
20   it was his plan, when you first called, to release
21   Steven David Cook; is that right?
22   A.   The jail had told me that.  I can't remember if he
23   said that as well.  I had been told that by someone with
24   the Sheriff's Department.
25   Q.   Was it your understanding, at that point, that he
```

```
1   had the authority to do so?
2   A.   I don't know if he has the authority to do so.
3   Q.   That's fine.  Now, let's look at the next sentence
4   in Exhibit Number 3.  This is kind of the most important
5   sentence of them all.
6            MR. ELLIS:  Which paragraph are you on?
7            MR. ADCOCK:  I'm on the 7th paragraph
8        from the top.
9            MR. ELLIS:  Okay.
10  BY MR. ADCOCK (CONT.):
11  Q.   He thanked me for the information, and that would
12  be Sheriff Pennington; is that right?
13  A.   Correct.
14  Q.   He thanked me for the information, but told me
15  that if the jail was going to be on the hook for
16  expensive medical treatment, he was going to have him
17  released.  Is that correct?
18  A.   Yes.
19  Q.   Okay. And when you wrote this on the 3rd of July
20  of 2012, that was your understanding of what the sheriff
21  had told you; is that right?
22  A.   Yes.
23  Q.   Okay. And the inference here being that the
24  sheriff just didn't want to pay the medical bills,
25  right?
```