IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK                                  PLAINTIFF

VS.                      NO. 4:15-CV-228 BRW

BRUCE PENNINGTON, ET. AL.,                    DEFENDANTS

EXHIBIT NO. 9
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

EXCERPTS FROM DEPOSITION
OF SERGEANT MIKE RICHARDS

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK ) Plaintiffs
)
VS. ) No. 4:15 CV 228-BRW
)
BRUCE PENNINGTON; )
LIEUTENANT DON BIRDSONG; )
ROGER L. TROXEL, M.D.; )
ANDY GILL; ADVANCED )
CORRECTIONAL HEALTHCARE, )
INC.; SALINE COUNTY, )
ARKANSAS; DEPUTY LAUREN )
FURR; SERGEANT RICHARDS; )
DEPUTY RYAN McKINNEY; and )
GLENN SONK, LPN ) Defendants.

ORIGINAL

---

ORAL DEPOSITION OF

MIKE RICHARDS

DECEMBER 14, 2015

---

ORAL DEPOSITION OF MIKE RICHARDS, produced as a witness at the instance of the Plaintiff, and duly sworn, was taken in the above-styled and numbered cause on December 14, 2015, from 9:14 a.m. to 10:09 a.m., before Crystal Garrison, Certified Court Reporter, in and for the State of Arkansas, reported by machine shorthand, at the offices of Ellis Law Firm, 126 North Main Street, Benton, Arkansas 72015, pursuant to the Federal Rules of Civil Procedure.

```
 1  take an inmate to a local doctor or to the emergency
 2  room?
 3  A.   The highest ranking supervisor on the scene.
 4  Q.   Okay.  So, whoever is the highest ranking officer
 5  there that day, when it became evident that someone
 6  needed medical care, or might need medical care, that
 7  highest ranking officer on scene that day made the
 8  decision whether to send someone to either a private
 9  doctor or an emergency room?
10  A.   Yes.
11  Q.   Okay.  And how was that decision made after Advanced
12  Correctional Healthcare came on board?
13  A.   The doctor would make -- the doctor or the nurse
14  would make a recommendation.
15  Q.   Okay.  And you say the nurse -- doctor or the nurse
16  would make a recommendation.  Did the doctor or the
17  nurse have the authority to make a final decision:  This
18  person will go to the emergency room?
19  A.   Yes.
20  Q.   Okay.  And is -- do you know if that was a policy
21  and practice of the jail or whether it was pursuant to
22  the contract that Advanced Correctional Healthcare had
23  with the county?
24  A.   Both.
25  Q.   Both?  Okay.  Did -- so, the bottom line from -- on
```

1  that issue is that from -- from September of 2011 until
2  the date in question in this lawsuit, at the end of June
3  of 2012, the doctor or the nurse at Advanced -- from
4  Advanced Correctional Healthcare, had the complete
5  prerogative to send someone to either the doctor or the
6  emergency room?
7  A.   Yes.
8  Q.   And it was their decision; is that your --
9  A.   In conjunction with the ranking officer, yes.
10 Q.   In conjunction with the ranking officer?
11 A.   Yes.
12 Q.   Well, see, I need to know who had the final
13 authority, the doctor or the ranking --
14 A.   The doctor.
15 Q.   -- officer?  The doctor.  So, is it a true statement
16 that if the doctor said a man needed to go to the
17 emergency room, it was incumbent upon the ranking
18 officer to get that man to the emergency room?
19 A.   Not the way you said it.
20 Q.   Well, how would you say it, then?
21 A.   If the doctor said he had to go --
22 Q.   Yeah.
23 A.   -- he went.  If the doctor say he needed to go or
24 might need to go or -- it was according to how he worded
25 it.

1  Q.    Okay.
2  A.    And it was worded different ways.
3  Q.    Okay. So you would parse the language of the doctor
4  to kind of --
5  A.    The doctor did --
6  Q.    -- make the decision?
7  A.    The doctor did that himself.
8  Q.    Okay. So, if the doctor said that an inmate or a
9  prisoner -- I want to use that term interchangeably here
10 for our purposes, all right?
11 A.    Correct.
12 Q.    If the doctor said that a -- an inmate had to go or
13 must go to the emergency room, then that would be the
14 controlling decision; is that correct?
15 A.    That's correct.
16 Q.    But if the doctor said that an inmate simply needed
17 to go or maybe should go, then the ranking officer on
18 duty at the time had the authority to make that
19 decision?
20 A.    Not exactly.
21 Q.    Well, tell me exactly how the decision was made, if
22 the doctor said the inmate needed to go to the emergency
23 room?
24 A.    Dr. Troxel was very careful how he worded things.
25 Q.    Uh-huh.

1  A.   He either made suggestions or he made a concrete
2  statement.  If he made a concrete statement, he wasn't
3  questioned, that's what we did.  If at times, he said,
4  "Well, I think" or "maybe" or there were times he said
5  "I don't know," we erred on the side of caution, if at
6  all possible.
7  Q.   All right.  By "we erred on the side of caution"
8  does that mean that if he said "I think" or "maybe,"
9  then you would go ahead and defer to his judgment and
10 take the prisoner to the emergency room?
11 A.   Okay.  You're trying to pin this down into every
12 situation, the same thing happened.  And that's --
13 Q.   Uh-huh?
14 A.   -- not the way it was.
15 Q.   Well --
16 A.   Every situation was based on the merits.
17 Q.   I understand.
18 A.   The doctor in conjunction with the supervising
19 officer.
20 Q.   I understand that.  But at some point, we've got to
21 decide who was in charge, okay?
22 A.   The doctor's decision was final.
23 Q.   All right.  The doctor's decision was final?
24 A.   Decision was final.
25 Q.   Decision.  But if the doctor was at all equivocal,

```
 1  then what happened?
 2  A.   We weighed the merits:
 3  Q.   "We" weighed the merits.  Who is the "we"?
 4  A.   Whoever the ranking supervisor was.
 5  Q.   Okay.  So, the -- if the doctor was equivocal about
 6  the need for medical care, then the ranking supervisor
 7  would ultimately make the decision?
 8  A.   No.
 9  Q.   Well, you can't have it both ways --
10  A.   Yes, sir.
11  Q.   -- sergeant.  Explain to me --
12  A.   I'm not a sergeant.
13  Q.   Oh, I'm sorry.  You're the jail administrator and --
14  A.   No, sir, I'm not.
15  Q.   -- right.  Now you're a civilian?
16  A.   That's correct.
17  Q.   Okay.  How would you prefer me to refer to you,
18  just --
19  A.   Mr. Richards is fine.
20  Q.   Okay.  Thank you.  That'll be fine.  But, you know,
21  you can't have it both ways, Mr. Richards, you've got to
22  -- somebody is ultimately responsible for this decision?
23  A.   The doctor's word is final.
24  Q.   The doctor's word is final?
25  A.   That's correct.
```

```
 1  Q.  Okay.  We'll talk about Officer McKinney's statement
 2  in just a minute.  But why don't you tell me what you
 3  recall the chronology of events on that day.
 4  A.  The first I heard of the situation, I was in the
 5  office, Lieutenant Birdsong was in the office, there
 6  were a couple of other people there, I don't know.  We
 7  was quitting time on a Friday.  I don't know.
 8      Lieutenant Birdsong was seated at my desk, I was
 9  seated at a blank chair, and someone was seated --
10  someone else -- no, Sergeant -- Lieutenant Birdsong was
11  seated at the other sergeant's desk.  And somebody was
12  seated at my desk.  And I was just sitting in a chair.
13  Q.  Okay.  Were you a sergeant at --
14  A.  Yes.
15  Q.  -- that point?  Tell me what happened in as much
16  detail as you can recall.
17  A.  Lieutenant Troxel came in the doorway -- I don't
18  remember --
19  Q.  Lieutenant Troxel or Dr.?
20  A.  I mean, Dr. Troxel.
21  Q.  Okay.
22  A.  I don't remember Ms. Furr at all.
23  Q.  Okay.
24  A.  Dr. Troxel came in the doorway and said -- how
25  specific do I need to be?
```

```
 1  Q.   She's heard it all.  Just go ahead and be as
 2  specific as you want to.
 3  A.   Said: You're not going to believe this shit.  I've
 4  seen something I've never seen before.
 5  Q.   Okay.
 6  A.   I remember the statement.
 7  Q.   Okay.
 8  A.   And Lieutenant Birdsong said:  "Well, it must be
 9  pretty bad, you being a doctor."  And he said:  "I got
10  some guy's got his ass hanging out."
11  Q.   Okay.  So, he said:  "I've got some guy --
12  A.   "That has his ass hanging out."
13  Q.   "That has his ass hanging out"?
14  A.   That's exactly what he said.
15  Q.   Okay.
16  A.   Or real -- pretty close.
17  Q.   Okay.  And what was said next and by whom?
18  A.   He asked Lieutenant Birdsong if he wanted to come
19  see it.  Birdsong said:  "I've never seen anything like
20  that."  And he said:  "Well, you need to come out here
21  and look at this."
22  Q.   Okay.
23  A.   And Birdsong said, "No, I don't need to see that."
24  Q.   Okay.
25  A.   He asked Lieutenant -- I mean, he asked Dr. Troxel:
```

1  "What do we need to do about it?"  Dr. Troxel said,
2  "Well, I think he needs to get out of here."
3  Q.    Okay.  "I think he needs to get out of here."  Okay.
4  A.    I don't remember the exact words, but that's pretty
5  close.  He didn't say he needed to go to the hospital.
6  He said we needed to release him.  I think that -- I
7  think is how the conversation went.
8  Q.    "We need --
9  A.    I wasn't involved in the conversation.
10 Q.    -- to release him."
11 A.    "Need to let him go.  Get him out of here."
12 Q.    "Let him go.  Get him out of here."  Something along
13 those lines?
14 A.    Yes.
15 Q.    Okay.  So, what happened next?
16 A.    If I remember right -- I don't remember all the
17 details, but -- it's been a long time ago.
18 Q.    Yeah.
19 A.    If I remember -- what I can remember, I think
20 Lieutenant Birdsong got on the phone and called Sheriff
21 Pennington.
22 Q.    Okay.  And what happened after that?  Oh, did you
23 hear the --
24 A.    No.
25 Q.    Lieutenant Birdsong's side of the conversation with

1  Sheriff Pennington?
2  A.    Just Lieutenant Birdsong's side.
3  Q.    Okay.  That's -- you did hear Lieutenant Birdsong's
4  side.  What did Lieutenant Birdsong tell Sheriff
5  Pennington?
6  A.    I think he repeated the statement that Dr. Troxel
7  had made when he came to the door.
8  Q.    Okay.  Okay.  Did he identify the inmate?
9  A.    I don't think -- I don't recall ever hearing his
10 name.  I don't recall -- remember doing that.  I don't
11 recall Dr. Troxel saying it or -- well, Pennington
12 wouldn't have known -- I mean, Birdsong wouldn't have
13 known because I don't think Troxel ever said the name.
14 Q.    Okay.
15 A.    That I remember.
16 Q.    That you remember.  Okay.  What happened next?
17 A.    Birdsong hung up the phone and said:  Well, I guess
18 we're going to let him go.
19 Q.    Okay.  And what happened after that?
20 A.    Someone came to the door -- the process was started.
21 I think -- I think at that time, Mr. McKinney -- Deputy
22 McKinney was the administrative assistant to the jail
23 administrator.  And I think he was there -- I think he's
24 the one that left and went to booking to get the process
25 started to let him go.

1  Q.   I just have a couple questions for you.  You gave us
2  a good rundown of the positions you held at the Saline
3  County Sheriff's Office.  I was wondering if you could
4  just give me a complete list of the chain of demand at
5  the Saline County Sheriff's Office, starting with the
6  sheriff and moving down?
7  A.   At that time?
8  Q.   At that time, yes, sir.
9  A.   The sheriff, the jail administrator, the three --
10 the three jail sergeants, the corporals, detention
11 officers.
12 Q.   I notice that the prosecutor's office is nowhere in
13 that list; is that correct?
14 A.   No, sir.
15 Q.   So, the --
16 A.   That's correct.
17 Q.   No one at the prosecutor's office has any authority
18 to give orders or commands to anyone at the sheriff's
19 office; is that accurate?
20 A.   Yes.
21      MR. FOWLER:  No further questions.
22                       EXAMINATION
23 QUESTIONS BY MR. JACKSON:
24 Q.   Mr. Richards, I have a couple questions.  We met
25 before the deposition.  My name's Ben Jackson, I