IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK                                              PLAINTIFF

VS.                    NO. 4:15-CV-228 BRW

BRUCE PENNINGTON, ET. AL.,                                    DEFENDANTS

EXHIBIT NO. 10
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

EXCERPTS FROM DEPOSITION
OF DEPUTY RYAN McKINNEY

```
 1              IN THE UNITED STATES DISTRICT COURT
                   EASTERN DISTRICT OF ARKANSAS
 2                       WESTERN DIVISION

 3   STEVEN DAVID COOK              ) Plaintiffs
                                    )
 4   VS.                            )
                                    ) No. 4:15 CV 228-BRW
 5   BRUCE PENNINGTON;              )
     LIEUTENANT DON BIRDSONG;       )
 6   ROGER L. TROXEL, M.D.;         )
     ANDY GILL; ADVANCED            )
 7   CORRECTIONAL HEALTHCARE,       )
     INC.; SALINE COUNTY,           )
 8   ARKANSAS; DEPUTY LAUREN        )
     FURR; SERGEANT RICHARDS;       )
 9   DEPUTY RYAN McKINNEY; and      ) Defendants.
     GLENN SONK, LPN                )
10   ---------------------------------------------

11                   ORAL DEPOSITION OF

12                     RYAN McKINNEY

13                   DECEMBER 14, 2015

14   ---------------------------------------------

15       ORAL DEPOSITION OF RYAN McKINNEY, produced as a
16   witness at the instance of the Plaintiff, and duly
17   sworn, was taken in the above-styled and numbered cause
18   on December 14, 2015, from 2:42 p.m. to 3:18 p.m.,
19   before Crystal Garrison, Certified Court Reporter, in
20   and for the State of Arkansas, reported by machine
21   shorthand, at the offices of Ellis Law Firm, 126 North
22   Main Street, Benton, Arkansas 72015, pursuant to the
23   Federal Rules of Civil Procedure.
24
25
```

1  A.    Security forces is the Air Force's term for police.
2  Q.    Okay. So, you -- that is in a sense, a law
3  enforcement job, I would think?
4  A.    Correct.
5  Q.    Okay. Well, thank you for your service, sir.
6  A.    Thank you.
7  Q.    You have in front of you what I've marked as Exhibit
8  No. 1 to your deposition. Do you recognize that
9  document?
10 A.    Yes.
11 Q.    Okay. What I would like to do is go through this
12 document and ask you some specific questions about what
13 happened. Okay?
14 A.    Yes.
15 Q.    Let's start with the very first paragraph that
16 begins on Friday June 29th. All right?
17 A.    (Nodding head.)
18 Q.    "I was in the Sergeant's office when I heard Dr.
19 Troxel explain to the jail administration that we really
20 needed to have Inmate Cook released due to his medical
21 condition."
22       Okay. Who was in the sergeant's office when you
23 heard Troxel explain "that we really need to have Cook
24 released"?
25 A.    I do not remember who was in the office.

```
 1  Q.  Well, you know you were in the office?
 2  A.  I was in the office.
 3  Q.  Okay. Troxel was in the office?
 4  A.  Troxel was in the office.
 5  Q.  Okay. And it says -- what you say in the sentence
 6  was that you heard Troxel explain to the jail
 7  administration.
 8  A.  Correct.
 9  Q.  What does that mean?
10  A.  The jail administration at the time --
11  Q.  Yes.
12  A.  -- was Lieutenant Birdsong, Sergeant Richards and
13  Sergeant Bentley. And possibly Sergeant -- and Sergeant
14  Lester. Those were the four jail administrators at the
15  time.
16  Q.  Okay. So, if Troxel explained to the jail
17  administration, at least one or more of these people had
18  to be present to hear the explanation; would that be
19  true?
20  A.  That would be true.
21  Q.  Okay. Was Lieutenant Birdsong there?
22  A.  I do not remember which of the four were in the room
23  at the time.
24  Q.  Okay. So, it would either be Lieutenant Birdsong,
25  Sergeant Richards, Sergeant Lester or who else?
```

1  A.   Sergeant Bentley.
2  Q.   Sergeant Bentley.  But you don't remember who was
3  present --
4  A.   No, sir --
5  Q.   -- at that point?
6  A.   I do not.  I do not remember who was in the room.
7  Q.   Okay.  The next sentence in your memo says:
8  "Immediately, under advisement of Dr. Troxel, Lieutenant
9  Birdsong got in touch with Sheriff Pennington."
10       MR. ELLIS:  Contact.
11       MR. ADCOCK:  You're right.
12 Q.   (BY MR. ADCOCK)  It says, "got in contact with
13 Sheriff Pennington"; how do you know that?
14 A.   I do not remember how I became aware of that
15 information.  I could speculate, but I'm not going to
16 speculate.  I know what happened, I put it in my report,
17 but I do not remember how I came about that information.
18 Q.   You wouldn't have put it in the report unless it was
19 true, though, right?
20 A.   Absolutely.
21 Q.   Okay.  So, on July the 6th of 2012, roughly 7 days
22 after the incident in -- on June the 29th, 2012, you
23 wrote that "Lieutenant Birdsong got in contact with
24 Sheriff Pennington"; is that correct?
25 A.   Yes, sir.

```
 1  Q.   Okay.  And certainly on July the 6th, you believed
 2  that to be a true statement?
 3  A.   Yes, sir.
 4  Q.   And you believe it to be a true statement today; is
 5  that right?
 6  A.   Yes, sir.
 7  Q.   Because you would never put something that was
 8  untrue in a record -- a law enforcement record of this
 9  nature?
10  A.   No, sir.
11  Q.   Okay.  The last part of that sentence says, "with"
12  -- in reference to Sheriff Pennington "who agreed to
13  release Inmate Cook on a signature bond."  How do you
14  know that?
15  A.   I do not know how I know that.  Same thing as
16  previous.  It's been years.  I do not know how I came
17  about that information.  And I'm not going to speculate
18  who or how I came about that information.
19  Q.   Well, it's not really your choice about whether or
20  not you'll speculate.  You're obligation today is to
21  simply -- is to answer the question.
22       MR. ELLIS:  And I object to the form of the
23  question.  It's not his obligation to speculate, though,
24  Ed.
25       MR. ADCOCK:  I understand.
```

```
 1  word.
 2  Q.    I understand.  It's been a -- you know, a while.
 3  But, you know, again, you did memorialize that phone
 4  conversation 6 days later on July the 6th?
 5  A.    Yes.
 6  Q.    Are you confident today that Gill told Crystal
 7  McKinney, quote, "that we were NOT to release him,"
 8  close quote?
 9  A.    It's an absolute fact, yes.
10  Q.    Okay.  So, that's an absolute fact.  You are certain
11  of that?
12  A.    Yes.
13  Q.    Did Gill have the authority to run the jail?
14  A.    No.
15  Q.    Who had the authority to run the jail?
16  A.    Sheriff Pennington.
17  Q.    Okay.
18  A.    And --
19  Q.    Did you ever hear anything from Sheriff Pennington
20  regarding the decision not to let Cook out of jail or
21  not to, quote, "release him," close quote?
22  A.    Not from Sheriff Pennington himself.
23  Q.    Okay.  How about Lieutenant Birdsong?
24  A.    Yes.
25  Q.    What did Lieutenant Birdsong tell you?
```

1  A.   That Sheriff Pennington said:  Do not release him.
2  Q.   Did Lieutenant Birdsong tell you any additional
3  specific facts regarding his conversation with Sheriff
4  Pennington in reference to Inmate Cook?
5  A.   No, sir.  Not that I can recall.
6  Q.   So, all you know is that Birdsong told you that
7  Pennington told him not to release Cook?
8  A.   Yes.
9  Q.   And in addition, you know that on -- you overheard
10 the phone call where Cook -- excuse me -- where Mr. Gill
11 said that, quote, "we were NOT to release him"; is that
12 correct?
13 A.   Yes.
14 Q.   Okay.  Now, the next paragraph says:  "Lieutenant
15 Birdsong and the sheriff were notified of the call from
16 Mr. Gill and what he said."  Who notified Birdsong and
17 the sheriff, to your knowledge?
18 A.   I do not know for a hundred percent fact who
19 notified them.
20 Q.   Did you?
21 A.   I believe Deputy Crystal McKinney told him -- walked
22 over and told the lieutenant.
23 Q.   Okay.  Well, since she was the one who received the
24 phone call, that would make sense --
25 A.   Yes.

1  up a report of that day; therefore, I wrote this report.
2  Q.   Okay.  When did -- Birdsong asked you to do a report
3  of what you said that day.  You mean of June 29th
4  regarding Inmate Cook?
5  A.   Lieutenant Birdsong asked me on July 6th, if I would
6  do a comprehensive brief report of the whole situation.
7  Q.   Okay.  Regarding --
8  A.   From the time --
9  Q.   -- Inmate Cook?
10 A.   Yes.
11 Q.   Okay.  Do you know why he needed that report?
12 A.   Lieutenant Birdsong liked reports on everything from
13 the smallest thing to the biggest thing.  And --
14 Q.   Okay.
15 A.   -- so.  And I was fairly good at writing reports;
16 therefore, he asked me.
17 Q.   Okay.  Did you ever -- did you have any idea on June
18 29th what was -- what medical issue Steven Cook had in
19 the jail?
20 A.   Could you elaborate and be more specific about
21 what --
22 Q.   Did you know what was wrong with him?
23 A.   No, sir.
24 Q.   Okay.  Okay.  Is it true that all you know is that
25 you heard Dr. Troxel explain to the jail administration

```
 1  that "we really needed to have Inmate Cook released"?
 2  A.    Yes, sir.
 3  Q.    Is that all you knew?
 4  A.    Yes, sir.
 5  Q.    Did you -- you didn't have any idea what was wrong
 6  with him?
 7  A.    Without some grotesque, and with all respect, I
 8  was -- I overheard one of them say, "There's something
 9  wrong with his butt hole."
10  Q.    Okay.  His rectum?
11  A.    Or rectum.
12  Q.    Okay.  And what exactly did you overhear, just that
13  there was something wrong --
14  A.    Yes --
15  Q.    -- with him?
16  A.    Yes, sir.  No details.
17  Q.    Okay.  Okay.  Do you know if anyone went down to the
18  cell and actually looked to see what was wrong with
19  Steven Cook?
20  A.    I know someone did, I cannot tell you who it was,
21  though.
22  Q.    Okay.
23  A.    Because I do not know.
24  Q.    Okay.  What was ordinarily the process or the
25  practice in the jail if an inmate needed to go to the
```

```
 1  hospital?  How did you guys go about meeting that
 2  medical need?
 3  A.   Our transport officer -- officers would take them to
 4  the hospital.
 5  Q.   Okay.  And who made the decision, generally, to
 6  release someone to go to the hospital?
 7  A.   The --
 8  Q.   Or to send them to the hospital?
 9  A.   The Lieutenant.  Or if the Lieutenant was not
10  available, Sergeant Lester, who was in charge of
11  transport.
12  Q.   Okay.  Did you have any authority or responsibility
13  with regard to that decision?
14  A.   No, sir.
15  Q.   Okay.  Do you know what authority Dr. Troxel had?
16  A.   I'm somewhat familiar with the authority Dr. Troxel
17  has.
18  Q.   What was the authority -- to your knowledge, what
19  authority did Dr. Troxel have?
20  A.   If Dr. Troxel said someone absolutely must go to the
21  hospital, we would take them to the hospital.
22  Q.   Okay.  And if Dr. Troxel said they needed to go to
23  the hospital, that was pretty much the last word; is
24  that what you're telling us?
25       MR. JACKSON:  Object to form.
```