IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK                                              PLAINTIFF

VS.                     NO. 4:15-CV-228 BRW

BRUCE PENNINGTON, ET. AL.,                                    DEFENDANTS

EXHIBIT NO. 11
TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

EXCERPTS FROM DEPOSITION
OF SHERIFF BRUCE PENNINGTON

COPY

```
                IN THE UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF ARKANSAS
                          WESTERN DIVISION


   STEVEN DAVID COOK
            Plaintiff

   vs.                             CASE NO. 4:15CV228-BRW

   BRUCE PENNINGTON, LT., DON BIRDSONG, ROGER L. TROXEL,
   M.D., ANDY GILL, ADVANCED CORRECTIONAL HEALTHCARE, INC.
   SALINE COUNTY, ARKANSAS DEPUTY LAUREN FURR, SGT
   RICHARDS, DEPUTY RYAN MCKINNEY AND LPN GLENN SONK
            Defendants


            ORAL DEPOSITION OF BRUCE PENNINGTON


   APPEARANCES:

         MR. EDWARD ADCOCK, ESQ.
            1018 Cumberland, #11
            Little Rock, Arkansas  72202


                *** For the Plaintiff ***


         MS. CHRISTINE A. CRYER, ESQ.
            State of Arkansas Attorney General
            323 Center Street, Suite 200
            Little Rock, Arkansas  72201; and

         MR. GEORGE D. ELLIS, ESQ.
            Ellis Law Firm, P.A.
            126 North Main Street
            Benton, Arkansas  72015; and
```

JEFF BENNETT
BUSHMAN COURT REPORTING
(501) 372-5115

```
 1   A.     Okay.
 2   Q.     Let's look at -- let's look at that document.  It
 3   indicates that you were informed of the medical
 4   condition of Steven David Cook; is that true?
 5   A.     True.
 6   Q.     Okay.  Let's just go back to the beginning on
 7   June 29th of 2012, and you tell me what you remember
 8   regarding this incident.  When did you first learn that
 9   there was an inmate with a medical problem in the jail?
10   A.     When Lieutenant Birdsong called me to inform me of
11   such.
12   Q.     What did Lieutenant Birdsong tell you?
13   A.     That Dr. Troxel informed him that we had an inmate
14   who had a medical issue and needed to be released.  And
15   that's when I informed Lieutenant Birdsong to book him
16   and release him.
17   Q.     Okay.  Your memory is that Lieutenant Birdsong
18   told you that Dr. Troxel said that the inmate needed to
19   be released; is that correct?
20   A.     Correct.
21   Q.     Okay.  Do you -- did Lieutenant Birdsong say
22   anything to you about possibly simply taking the inmate
23   to the hospital?
24   A.     I don't recall that.
25   Q.     Okay.  What did Birdsong tell you was the problem,
```

```
 1   the medical problem?
 2   A.    That he had a prolapse problem with his intestine.
 3   Q.    Did you understand that the problem was that
 4   his -- he had a rectal prolapse where part of the colon
 5   was actually coming outside the rectum?
 6   A.    I know that's what was occurring --
 7   Q.    Okay.
 8   A.    -- per what Lieutenant Birdsong was telling me --
 9   Q.    Okay.
10   A.    -- that the doctor had told him.
11   Q.    Okay.  Did you ever come down to the jail and
12   speak directly with Dr. Troxel?
13   A.    No.
14   Q.    Okay.  The only person you spoke with was
15   Lieutenant Birdsong; is that correct?
16   A.    That's correct.
17   Q.    And I know you've said this before, and I'm sorry
18   for being repetitive.  But Birdsong told you that Dr.
19   Troxel said that a inmate had a medical issue and needed
20   to be released --
21   A.    Correct.
22   Q.    -- is that right?
23   A.    Correct.
24   Q.    And the medical issue was a rectal prolapse?
25   A.    Correct.
```

1  Q.   Okay.  So what did you tell Birdsong when he told
2  you that?
3  A.   To book him and release him.
4  Q.   Okay.  And that was within the scope of your
5  authority as Sheriff; is that correct?
6  A.   Correct.
7  Q.   Okay.  Was he also ultimately released per your
8  order?
9  A.   You know, I don't know, because when I always gave
10 an order for somebody to do something.  And I know
11 assuming can sometimes bite you.  But I had known
12 Lieutenant Birdsong since childhood, and we had a very
13 good working relationship.  And I just assumed that he
14 was released.
15 Q.   So you assumed he was released?
16 A.   Yes, sir.
17 Q.   Did you ever -- when did you first learn that the
18 inmate was not released that day?
19 A.   I don't recall, sir.
20 Q.   Okay.  Did you talk with anyone else regarding
21 this medical problem and the need to release the inmate?
22 A.   No, sir.
23 Q.   Specifically, did you talk with Andy Gill about
24 this inmate?
25 A.   Andy Gill contacted -- it first went through

```
1    Lieutenant Birdsong.  Then he contacted me that Mr. Cook
2    was able to do this on his own at any given time, and
3    that he wanted him to remain in custody because of
4    someone being scared or concerned that Mr. Cook might
5    harm them.
6    Q.   Okay.  Now, did Andy Gill tell you that?
7    A.   I can't recall if it was Andy that did or if it
8    was Lieutenant Birdsong.  One of the two did, but I
9    don't recall.
10   Q.   You don't specifically recall hearing from Andy
11   Gill?
12   A.   I can't remember if I did or not.
13   Q.   Okay.  Do you recall whether you heard -- you
14   talked directly to Dr. Troxel?
15   A.   I've never talked directly to Dr. Troxel.
16   Q.   Okay.
17   A.   As a matter of fact, if he was in this room right
18   now with three other people, I couldn't pick out which
19   one he would be.
20   Q.   Okay.  So when did you -- you indicated that you
21   heard from somebody that Gill said that the inmate could
22   push the colon out of his rectum at will; is that what
23   you --
24   A.   Yes, sir.  That's correct.
25   Q.   And that he could replace it?
```

1  A.    And I -- and Lieutenant Birdsong was also very
2  strong with his people wanting to make sure that they
3  documented things.
4  Q.    Okay. Well, let's look at the paragraph 1 of
5  Exhibit Number 1. It says -- and this is McKinney
6  talking. On Friday, June 29, I was in the Sergeant's
7  office when I heard Dr. Troxel explain to the jail
8  administration that we really needed to have Inmate Cook
9  released due to his medical condition. Immediately,
10 under advisement of Dr. Troxel, Lieutenant Birdsong got
11 in contact with Sheriff Pennington, who agreed to
12 release Inmate Cook on a signature bond. The booking
13 officers were then notified to release him.
14       And as far as this goes, is this a correct
15 statement?
16 A.    Yes.
17 Q.    As best you recall?
18 A.    Best I recall, yes, sir.
19 Q.    Okay. It is true that you told Birdsong to
20 release Steven David Cook?
21 A.    Correct.
22 Q.    Okay. And that was based on what Birdsong told
23 you about the Cook -- about what the doctor told him of
24 Cook's medical condition?
25 A.    Correct.

```
 1   Q.    Okay.  Let's look at the second paragraph.
 2         Shortly thereafter -- again, this is McKinney
 3   talking.  Shortly thereafter, I was in the booking area
 4   when Deputy Crystal McKinney received a call from Saline
 5   County Prosecutor, Andy Gill.  The phone was on
 6   speakerphone.  So I overheard the call.  Mr. Gill stated
 7   that Inmate Cook could push his rectum inside out,
 8   quote, "at will," close quote, and that we were not to
 9   release him.
10         Is this a true statement, as far as you know?
11   A.    Yes, it is.
12   Q.    Okay.  And how do you -- were you present for this
13   phone call?
14   A.    No, I wasn't.
15   Q.    As a matter of fact, your previous testimony is
16   that you never talked to either Dr. Troxel or Andy Gill
17   directly about this --
18   A.    Correct.
19   Q.    -- is that right?
20   A.    That's correct.
21   Q.    What information do you have that leads you to
22   believe that the -- that, in fact, as evidenced in this
23   second paragraph, Gill stated that Inmate Cook could
24   push his rectum inside out and that we were not to
25   release him?
```

1   A.    Lieutenant Birdsong called me --
2   Q.    All right.
3   A.    -- from his office to my office, and told me that
4   Mr. Gill had called and said that we were not to release
5   Inmate Cook because of his ability to do -- to push his
6   rectum inside out and put it back in.
7   Q.    Okay.
8   A.    And so Lieutenant Birdsong said we would hold him
9   until Monday, when he would go before the judge.
10  Q.    Okay. So was it -- that goes contrary to your
11  original instructions?
12  A.    It does. I, as Sheriff, as any other Sheriff
13  throughout the state, try to work hand-in-hand with the
14  Prosecutor's Office. And we try to adhere to, you know,
15  their request. And that's what we did.
16  Q.    Okay. Now, but your testimony, I believe, was
17  that Birdsong told you that, quote, "we," I believe
18  that's the word you used, "We were gonna keep him until
19  Monday morning and let him go before the judge and see
20  what kind of bond he got." Something like that, right?
21  A.    That's correct.
22  Q.    Okay. Now, if Birdsong told you that, you had the
23  authority to overrule him, didn't you?
24  A.    Of course, I did.
25  Q.    Okay. Did you overrule him?

```
1    A.    No, I did not.
2    Q.    So you -- you had to make the decision?
3    Ultimately, it was your decision; is that correct?
4    A.    That's correct.
5    Q.    And your decision was -- based on what Lieutenant
6    Birdsong told you Andy Gill said, your decision was to
7    keep him until Monday and let him go before the judge?
8    A.    That's correct.
9    Q.    And you understood that when he went before the
10   judge he might be released?
11   A.    Correct.
12   Q.    Or that he might get a signature bond or whatever,
13   right?
14   A.    Right.
15   Q.    Okay.  You also understood, in making this
16   decision, that if you didn't release him, he was gonna
17   have to stay in jail over the weekend --
18   A.    Correct.
19   Q.    -- is that right?
20   A.    That's correct.
21   Q.    And you knew that the doctor had told Birdsong,
22   who told you, that he had a medical problem and needed
23   to be released, right?
24   A.    Right.
25   Q.    So you chose getting along with the prosecutor
```

```
 1  over the medical needs as expressed by the doctor --
 2  A.    Well --
 3  Q.    -- is that right?
 4              MR. ELLIS:  Object to the form of the
 5          question.  Go ahead and answer.
 6  Q.    Go ahead and answer.
 7              MR. ELLIS:  If you can.
 8  A.    What I was going to say was, having knowledge that
 9  Mr. Cook had the ability to do this condition on his
10  own, I decided that if he could do that, and obviously
11  Mr. Gill had knowledge that he could, so I just decided
12  it would be in the best interest of justice to hold him
13  over until Monday where he could see the judge.
14  Q.    Okay.  Let's talk about this knowledge that --
15  alleged knowledge that Steven David Cook could push his
16  rectal -- cause a prolapsed colon and then reinsert it
17  at will.
18        You heard that directly from Mr. Birdsong?
19  A.    Correct.
20  Q.    Who heard that from Andy Gill?
21  A.    Correct.
22  Q.    Do you know where Andy Gill got that information?
23  A.    I do not.  I don't have any idea.
24  Q.    Okay.  It is at least third-hand hearsay; is that
25  right?
```

```
1    A.    Correct.
2    Q.    And essentially you made the decision based upon
3    third-hand hearsay, without contacting the doctor, to
4    keep him in jail over the weekend?
5    A.    Correct.
6    Q.    Did you ever call the doctor and ask him why
7    this -- he had made his recommendation that Mr. Cook
8    needed to be released?
9    A.    I did not.
10   Q.    Okay.  Do you know if a rectal prolapse causes
11   bleeding?
12   A.    I do not.
13   Q.    You don't know?
14   A.    No.
15   Q.    If it causes bleeding, do you know -- I don't
16   imagine you would know how much it might bleed?
17   A.    I would not know.
18   Q.    Would you know whether it would pose a threat to
19   Mr. Cook's health to leave this prolapse untended for
20   another three days?
21   A.    I would not.
22   Q.    Okay.  But based upon your desire to have good
23   working relations with the prosecutor, you decided,
24   nevertheless, to keep Cook in jail?
25   A.    That's correct.
```

```
 1   Q.    Okay.  Who has the responsibility for seeing that
 2   roommates in the Saline County Jail receive appropriate
 3   medical care while incarcerated?
 4   A.    That's up to the medical staff that's on board.
 5   Q.    Ultimately, the medical staff is subject to your
 6   decision-making.  You run the jail, don't you?
 7   A.    I run the jail.  But they're an independent
 8   company --
 9   Q.    Uh-huh.
10   A.    -- that's hired by Saline County to facilitate the
11   medical needs in the jail.
12   Q.    Okay.  So it's up to Correctional Health -- or
13   Advanced Correctional Healthcare, right?
14   A.    Right.
15   Q.    But you overruled them?  You knew the doctor said
16   he needed to go -- to be released, and you decided to
17   keep him anyway?
18   A.    Correct.
19   Q.    So ultimately that decision boiled down to you,
20   didn't it?
21   A.    Yes.
22   Q.    Okay.  Who -- are you familiar with the terms of
23   the contract between Saline County and Advanced
24   Correctional Healthcare?
25   A.    Somewhat.
```

```
 1   A.      -- that he could do this at will.
 2   Q.      I understand.
 3           But your -- you knew, when you made the decision
 4   to keep him over the weekend, that the doctor had
 5   recommended his release?
 6   A.      Yes.
 7   Q.      Okay.  Now, let's talk about Andy Gill for a
 8   second.  Did Andy Gill have any authority whatsoever to
 9   run that jail?
10   A.      No.
11   Q.      He couldn't order anybody to do anything in the
12   jail; is that right?  He had no actual authority to
13   order Birdsong to keep Steven David Cook?
14   A.      Correct.
15   Q.      Only you could do that?
16   A.      Correct.
17   Q.      Do you know anything about a rectal prolapse?
18   A.      No.
19   Q.      At the time all you knew was that the physician
20   who had been contracted with to provide medical care in
21   the jail said he needed to be released?
22   A.      Correct.
23   Q.      And you chose to ignore the medical evidence and
24   to leave him in jail over the weekend?
25   A.      When Mr. Gill informed us that Mr. Cook had the
```

```
 1  ability to do this at will, and had done it before as a
 2  get-out-of-jail card, I decided that as far as being an
 3  emergency situation that he needed to be released, since
 4  he had the ability to do that to himself, for him to
 5  stay until Monday to see the judge.
 6  Q.    Did you, of your own personal knowledge, know that
 7  he had ever been -- that this had ever happened before?
 8  A.    Not personally, no.
 9  Q.    Okay.  Did you have any information to the effect
10  that he had ever been released from jail before on the
11  basis of this?
12  A.    No.
13  Q.    You didn't know how serious the medical condition
14  was, did you?
15  A.    No.
16  Q.    Without any knowledge of the seriousness of the
17  medical condition, nevertheless, you decided to ignore
18  the advice of the doctor?
19  A.    After conferring with Lieutenant Birdsong.
20  Q.    Uh-huh.
21  A.    And I don't know if Lieutenant Birdsong heard the
22  conversation from Andy Gill or not.  But, you know, I
23  had asked Lieutenant Birdsong, since he was the Jail
24  Administrator, did he think it would be harmful to
25  Mr. Cook if he stayed the weekend.  And his response was
```

```
 1   no.  And so that's when I decided to keep him and hold
 2   him --
 3   Q.    Yeah.
 4   A.    -- until Monday for court.
 5   Q.    And where did Mr. Birdsong get his medical
 6   degree?
 7   A.    I don't know.
 8   Q.    Okay.  The only person in this transaction who had
 9   a medical degree is Dr. Troxel, right?
10   A.    Right.
11   Q.    And he said he needed to be released, right?
12   A.    Right.
13   Q.    And the non-doctors made the decision not to
14   release him?
15   A.    Correct.
16   Q.    Okay.  On the recommendation of somebody who had
17   no authority whatsoever to run the jail?
18   A.    Correct.
19   Q.    Do you know what area of the jail Steven David
20   Cook was in at that time?
21   A.    I do not.
22   Q.    Are there cameras that record what happened inside
23   the jail cells adjacent to the book-in area?
24   A.    Yes.
25   Q.    Do you know if contemporaneously anybody filed a
```

```
 1   medical care to our inmates.
 2              MR. JACKSON:  Okay.  That's all the
 3       questions I have.  Thank you, sir.
 4              THE WITNESS:  Yes, sir.
 5                   RE-EXAMINATION
 6   BY MR. ADCOCK:
 7   Q.   Regardless of what Andy Gill told you, it was your
 8   decision.  The bottom line is, your decision, you had
 9   the authority to release him or not, right?
10   A.   The buck stops here.  Yes, sir.  You're right.
11   Q.   The buck stops with you?
12   A.   Yes.
13   Q.   And in this case, your decision was to keep him
14   despite the recommendation of the doctor?
15   A.   Yes, sir.
16              MR. ADCOCK:  Okay.  That's all I have.
17              MR. JACKSON:  No questions.
18              MS. CRYER:  None.
19                   RE-EXAMINATION
20   BY MR. ELLIS:
21   Q.   But as far as you know, when Dr. Troxel made that
22   recommendation, he was not aware of the additional fact
23   that this detainee could manipulate his prolapse at will
24   in order to get out of jail?
25   A.   That's correct.
```