# MEDICAL INFORMATION

BOOKING# 3110-12
SO# 2001061990
NAME: COOK,STEVEN

| | |
|---|---|
| Heart Trouble: | NO |
| High Blood Pressure: | NO |
| Asthma: | NO |
| Diabetes: | NO |
| TB: | NO |
| Epilepsy / Seizures: | NO |
| VD: | NO |
| Body Orifices: | NO |
| Lice / Vermin: | NO |
| Alcoholism: | NO |
| Drug Addiction: | NO |
| Attempted Suicide: | NO |
| Mental Illness: | NO |
| Special diet: | NO |
| L.M.P.: | NO |
| IF YES TO ANY GIVE | ABNORMAL DISCHARGE AND HE STATED HE TAKES |
| DATE, TREATMENT, AND DOCTOR: | HYDROCONDONE AND HAS RECTAL PROLASPE |
| EVIDENCE OF RECENT INJURIES TO INMATE: | |
| HOW WERE INJURIES RECEIVED | |
| ACCORDING TO INMATE: | |
| WAS INMATE TREATED FOR THESE | |
| INJURIES PRIOR TO ADMISSION: | |

I certify that the medical information given at the time of book-in is true and correct.

I have allergies to the following: DILANTIN AND FENARBABOTHAL

I am currently taking the following prescription drugs:

ANY MEDICATIONS OR PROBLEMS THAT NEED ATTENTION:

I will reimburse SALINE County for any medical expenses I incur while incarcerated in the SALINE County Jail at Actual cost. I understand that if I am indigent and unable to pay then I will still be treated. If I receive any funds at anytime I am incarcerated in the SALINE County Jail then my inmate account will be debted to pay this indebtedness.

| RISK FACTORS | YES | NO | COMMENTS |
|---|---|---|---|
| MEDICAL | | | |
| MENTAL | | | |
| SUICIDE | | | |
| OTHER | | | |

DATE 06/29/2012                    BOOKING OR ARRESTING OFFICER SIGNATURE

EXHIBIT B

## PROPERTY RECORD

| BIN NO: | OFFICER'S SIGNATURE | | JAILER'S SIGNATURE: |
|---|---|---|---|
| BILLS: | CHANGE: | CHECKS: | JEWELRY DISC: |
| LIGHTER: | CIGARETTES: | COMB/BRUSH: | OTHER PROPERTY: |
| WALLET: | BELT: | KEYS: | PEN/PENCIL: |
| PURSE: | KNIFE: | SHOELACES: | D.L. |
| CHECKBOOK: | COMPACT: | TICKET: | |
| VEH. STORAGED: | YES | NO | |
| MAKE: | MODEL: | LIC: | |
| VIN: | CONDITION OF VEH: | | PRISONER'S BOOKING SIGNATURE: |
| WHERE STORED: | | | RELEASING JAILER: |
| REMARKS: | | | PRISONER'S RELEASE SIGNATURE: |

## PRISONER CHARGE-OUT RECORD

| DATE REMOVED: | TIME REMOVED: | COURT DATE: | JAILER: |
|---|---|---|---|
| OFFICER REMOVING PRISONER: | | COURT DISP: | DATE RETURNED: |
| DATE REMOVED: | TIME REMOVED: | COURT DATE: | JAILER: |
| OFFICER REMOVING PRISONER: | | COURT DISP: | DATE RETURNED: |
| DATE REMOVED: | TIME REMOVED: | COURT DATE: | JAILER: |
| OFFICER REMOVING PRISONER: | | COURT DISP: | DATE RETURNED: |
| DATE REMOVED: | TIME REMOVED: | COURT DATE: | JAILER: |
| OFFICER REMOVING PRISONER: | | COURT DISP: | DATE RETURNED: |

## NOTICE OF DETAINER

| | |
|---|---|
| FOR AGENCY: | |
| WARRANT NO: | |
| CHARGE: | |
| AUTHORIZED BY: | |
| DATE: | TIME: |
| OTHER HOLDS: | |

## PRISONER INJURY AND ILLNESS SCREEN

| | | |
|---|---|---|
| DO YOU HAVE ANY INJURIES OR CONDITIONS THAT NEED EMERGENCY TREATMENT: | YES | (NO) |
| WILL YOU EXCEPT TREATMENT IF NEEDED? | (YES) | NO |
| DO YOU HAVE HEPATITIS, TUBERCULOSIS, HIV OR OTHER CONTAGIOUS DISEASES? | YES | (NO) |
| DO YOU HAVE MEDICAL OR DENTAL INSURANCE? IF YES, COPY INSURANCE CARD. | YES | (NO) |
| ARE YOU ALLERGIC TO ANY FOOD OR MEDICATION? (ATTACH LIST) DILANTIN PEBERBARBOTHAl | (YES) | NO |
| DO YOU WEAR GLASSES AND OR CONTACTS? | YES | (NO) |
| DO YOU HAVE ANY DENTAL CONDITIONS? IF YES, WHAT KIND? | YES | NO |

**MEDICAL OBSERVATIONS:**

DO YOU HAVE ANY OF THE FOLLOWING ILLNESSES OR DISEASES: CHECK ALL THAT APPLY  RECTAL PROLAPSE

| MEDICAL OBSERVATIONS: DOES INMATE APPEAR TO HAVE ANY OF THE BELOW: | | | |
|---|---|---|---|
| SUICIDAL TENDENCY? | YES | (NO) |
| RISK OF ASSAULT? | YES | (NO) |
| SIGN OF TRAUMA | YES | (NO) |
| SIGN OF ILLNESS | YES | (NO) |
| SKIN DISORDERS | YES | (NO) |
| INFECTIONS | YES | (NO) |
| TROUBLE BREATHING | YES | (NO) |
| AFFECTED BY DRUGS | YES | (NO) |
| AFFECTED BY ALCOHOL | YES | (NO) |
| AFFECTED BY MEDICATION | YES | (NO) |

| VENEREAL DISEASE | ABNORMAL DISCHARGE | HIGH BLOOD PRESSURE | | ASTHMA |
|---|---|---|---|---|
| ARTHRITIS | SEIZURES | HEART DISEASE | DIABETES | HEAD INJURIES |

| | | |
|---|---|---|
| DO YOU HAVE A SPECIAL DIET PRESCRIBED BY DOCTOR OR FOR RELIGIOUS REASONS? | YES | (NO) |
| DESCRIBE DIET: | | |
| ARE YOU TAKING MEDICATION? IF YES, WHAT MEDICTION? HYDROCODONE | (YES) | (NO) |
| HAVE YOU RECENTLY BEEN HOSPITALIZED FOR MEDICAL OR PSYCHIATRIC REASONS? | YES | (NO) |
| ARE YOU PREGNANT? IF SO, HOW FAR ALONG ARE YOU? | YES | (NO) |

| | | | |
|---|---|---|---|
| OFFICER'S SIGNATURE: | | DATE: 06-29-12 | TIME: 11:55 |
| INMATE'S SIGNATURE: | | DATE: | TIME: |

## RELEASE INFORMATION

| | | | | |
|---|---|---|---|---|
| RELEASING OFFICER: | DATE: | TIME: | TYPE RELEASE: | BOND AMOUNT: |
| COURT DATE | TIME: | | COURT: | BOND COMPANY |
| CONDITION OF RELEASE OR SENTENCE: | | | | |

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK          ) Plaintiffs
                           )
VS.                        ) No. 4:15 CV 228-BRW
                           )
BRUCE PENNINGTON;          )
LIEUTENANT DON BIRDSONG;   )
ROGER L. TROXEL, M.D.;     )
ANDY GILL; ADVANCED        )
CORRECTIONAL HEALTHCARE,   )
INC.; SALINE COUNTY,       )
ARKANSAS; DEPUTY LAUREN    )
FURR; SERGEANT RICHARDS;   )
DEPUTY RYAN McKINNEY; and  ) Defendants.
GLENN SONK, LPN

------------------------------------

ORAL DEPOSITION OF

MELISSA FURR

DECEMBER 14, 2015

------------------------------------

ORAL DEPOSITION OF MELISSA FURR, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on December 14, 2015, from 1:17 p.m. to 2:01 p.m.,

before Crystal Garrison, Certified Court Reporter, in

and for the State of Arkansas, reported by machine

shorthand, at the offices of Ellis Law Firm, 126 North

Main Street, Benton, Arkansas 72015, pursuant to the

Federal Rules of Civil Procedure.

EXHIBIT C

Page 12

1    statement, even though it does not bare your actual

2    signature; is that correct?

3    A.    To be completely honest, I don't know why it's not

4    signed.  I mean --

5    Q.    Okay.

6    A.    I remember the incident happening.

7    Q.    Uh-huh.

8    A.    I can't remember an exact time that I sat down and

9    wrote this.  But this looks like something I wrote.

10   Q.    Okay.

11   A.    But I'm not sure why it's my sign -- why it's not

12   signed.

13   Q.    Okay.  Well, let's take a look at it.

14   A.    Okay.

15   Q.    And I want you to tell me if everything on it is

16   correct.  And I'll ask you some specific questions about

17   it.  It's -- looking at the first paragraph from the

18   top, in the text of the memorandum, it says:  "On June

19   29th, 2012 at approximately 1430 hours, I was called to

20   the booking area in reference to a inmate complaining of

21   something coming out of his rectum."  Is that a true

22   statement?

23   A.    Yes, sir.

24   Q.    Okay.  And that inmate was Steven David Cook; is

25   that correct?

Page 36

1   A.   Yes, sir.

2        MR. JACKSON:   That's all the questions I have.

3   Thank you.

4                    EXAMINATION

5   QUESTIONS BY MR. ELLIS:

6   Q.   A couple of housekeeping matters now, Ms. Furr.  I

7   notice that you're memorandum of July 5th, 2012, which

8   is Exhibit No. 1 to your deposition, it's addressed to a

9   Corporal Brown.  Who is Corporal Brown?

10  A.   Corporal Eric Brown, he was my corporal at the time.

11  Q.   Okay.  And is -- but that'd have been your direct

12  supervisor?

13  A.   Yes.

14  Q.   When you say that you were the escort for the doctor

15  and the nurse as they made their rounds in the jail --

16  A.   Yes, sir.

17  Q.   -- you carried a TASER, didn't you?

18  A.   Yes, sir.

19  Q.   Did you ever have to use it?

20  A.   Yes, sir.

21  Q.   How many times?

22  A.   I don't remember.  Several.

23  Q.   Did you ever use it on their behalf?

24  A.   No, sir.

25  Q.   Okay.  But the point is:  They didn't carry a TASER,

Page 37

1    did they?

2    A.    No, sir.

3    Q.    And you were escorting them for their safety?

4    A.    Yes, sir.

5    Q.    Not to assist them in medical matters?

6    A.    Correct.

7    Q.    Is that correct?

8    A.    Correct.

9    Q.    Okay.   And you're now a probation officer?

10   A.    Yes, sir.

11   Q.    What do probation officers do?

12   A.    We're adult babysitters.

13   Q.    I know.

14   A.    We make sure the people are doing what they're

15   supposed to do.   Drug court.   My -- my new -- my new --

16   as a probation officer, I work with our district drug

17   court program.

18   Q.    Okay.

19   A.    Getting people in drug treatment and drug tests and

20   making sure people pay their fines on time and meeting

21   with them, you know, talking to them if they have

22   problems, keeping up with them.   Just...

23   Q.    Are you a county employee or a state employee?

24   A.    I am -- we are -- we are privately owned.   Southwest

25   Probation is a privately owned business.

COPY

```
1              IN THE UNITED STATES DISTRICT COURT
                 EASTERN DISTRICT OF ARKANSAS
2                      WESTERN DIVISION

3

4    STEVEN DAVID COOK
                   Plaintiff
5
     vs.                            CASE NO. 4:15CV228-BRW
6
     BRUCE PENNINGTON, LT., DON BIRDSONG, ROGER L. TROXEL,
7    M.D., ANDY GILL, ADVANCED CORRECTIONAL HEALTHCARE, INC.
     SALINE COUNTY, ARKANSAS DEPUTY LAUREN FURR, SGT
8    RICHARDS, DEPUTY RYAN MCKINNEY AND LPN GLENN SONK
                   Defendants
9

10           ORAL DEPOSITION OF ANDREW GILL

11

12   APPEARANCES:

13       MR. EDWARD ADCOCK, ESQ.
            1018 Cumberland, #11
14          Little Rock, Arkansas  72202

15              *** For the Plaintiff ***

16       MS. CHRISTINE A. CRYER, ESQ.
17       MR. T. J. FOWLER, ESQ.
            State of Arkansas Attorney General
            323 Center Street, Suite 200
18          Little Rock, Arkansas  72201; and

19

20       MR. GEORGE D. ELLIS, ESQ.
            Ellis Law Firm, P.A.
21          126 North Main Street
            Benton, Arkansas  72015; and

22

23

24              EXHIBIT  D

25
```

EXHIBIT D

1    have any case pending regarding my client in this case,

2    Stefany David Cook?

3    A.    Yes.

4    Q.    Can you describe for me what cases you had pending

5    regarding Mr. Cook?

6    A.    Can I look at this?

7    Q.    Of course.

8    A.    Okay.

9    Q.    And what is that that you're looking at?

10   A.    This was something that was given already in

11   discovery.  This is a two-page document that was created

12   on June -- or July the 3rd of 2012, that related to

13   Mr. Cook.

14   Q.    Okay.  I don't remember seeing this document

15   before.  Do you know who created it?

16   A.    I created it.

17   Q.    You did?

18   A.    I did.

19   Q.    Okay.

20              MR. ADCOCK:  Was it sent to --

21              MS. CRYER:  Yes.  It was attached to our

22         discovery responses.  In fact, I think it was

23         the only document that we produced along with

24         our written responses.

25              MR. ADCOCK:  Okay.  I'm sure it was

8

```
 1            there, but I don't remember it now.  So let's
 2            mark it as Exhibit 3 to this deposition.
 3                 (Deposition Exhibit 3 was marked.)
 4                 MR. ADCOCK:  And Exhibit 1 and 2 are
 5            going to be the McKinney and Furr memos.
 6                 (Deposition Exhibits 1 and 2 were
 7            marked.)
 8  BY MR. ADCOCK (CONT.):
 9  Q.    And did you prepare this?
10  A.    Yes.
11  Q.    Okay.
12                 MR. ADCOCK:  Bucky, can we get a couple
13            of copies of that?
14                 MR. ELLIS:  Sure.
15                 (A recess was had.)
16  BY MR. ADCOCK (CONT.):
17  Q.    We're back on the record.  I'm going to skip on
18  part of this.  But my understanding, looking at what we
19  have marked as Exhibit Number 3, is that on June 25th of
20  2012, Stefany Cook came to the Prosecutor's Office and
21  indicated that she feared the defendant in that case,
22  the plaintiff in this case, Steven David Cook; is that
23  right?
24  A.    Yes.  And can I qualify that just a minute?
25  Q.    Sure, yes.
```

1   Q.     Okay.  So it was a revocation on a suspended

2   sentence, and it was your discretion as to whether to

3   file, your office's discretion?

4   A.     That's my understanding.

5   Q.     Okay.  And the sentence goes on to say, and that

6   it was a long-term issue and not something he sought

7   emergency treatment for.

8          What led you to believe that this prolapsed colon

9   was a long-term issue?

10  A.     Information from Stefany.

11  Q.     Okay.  And that it was not something he sought

12  emergency treatment for, where did you get that

13  information?

14  A.     Those are my words.

15  Q.     Yes.

16  A.     But the way I comprised or composed that would

17  have been Stefany described it as something that

18  happened to him regularly.  That this condition, when he

19  would defecate it would happen.  And that this had been

20  something that he had been dealing with for some time.

21  Q.     Okay.  And the last sentence says, I confirmed

22  this with Mrs. Cook, who stated that this occurred every

23  time he used the bathroom, and that he can put it back

24  in.

25         Where did you get that information?

1   A.    From Stefany.

2   Q.    Okay.  Is it true that all of the information

3   contained in this paragraph came from Stefany Cook?

4   A.    I believe so.  I can't remember if that had been

5   an issue with him previously in the jail or not.  So I

6   know that the majority of the information that I ever

7   got about that condition came from Stefany.

8   Q.    Okay.

9   A.    I don't know whether or not there were other

10  sources.  At this point, I don't know if I've lumped all

11  that in in my brain as Stefany, or if I heard some of it

12  from other sources.

13  Q.    Okay.  At this point, you can't remember any other

14  source; is that correct?

15  A.    Correct.

16  Q.    Okay.

17  A.    And if it would have been another source, it would

18  have been like the jail or law enforcement or something

19  like that.  I never talked to any doctor or other family

20  member.

21  Q.    Have you seen any medical record from the jail,

22  for example, that would indicate any previous instances

23  where he was able to protrude his colon?

24  A.    On July 3rd?

25  Q.    Yes.

1    A.    No.

2    Q.    Did you have any records from the jail?

3    A.    Not that I recall.

4    Q.    Okay.  At this point, do you know whether this

5    ever happened in the jail before Friday, June 29, 2012?

6    Do you have any independently verifiable fact that would

7    prove or establish that this had previously happened in

8    the jail?

9    A.    Not that I'm aware of.

10   Q.    Okay.  Do you have any proven or independently

11   verifiable fact, other than what Stefany Cook told you,

12   that this had ever happened anywhere?

13   A.    I've been told that there are medical records.  I

14   didn't know that at this time.

15   Q.    Okay.

16   A.    But now, that showed that this was a condition

17   that had occurred over a period of years.

18   Q.    I'm assuming you've heard that from your attorney

19   or whatever.  I don't want you to tell me what she told

20   you.  Okay.

21   A.    Okay.

22   Q.    Your communications with her are privileged.

23   A.    Sure.  I have not reviewed any medical records.

24   Q.    Okay.  Of your own personal knowledge, you have no

25   independently verifiable fact that would prove that

Steven Cook has prior convictions for Forgery in the First Degree for passing counterfeit U.S. currency; He has prior felony conviction for Theft by Receiving; He has a prior felony conviction for Breaking or Entering; He has a prior felony drug conviction; He has a prior conviction for Residential Burglary; He has a prior felony conviction for Terroristic Threatening in the First Degree.

Steven Cook is currently on parole and serving the suspended portion of a prison sentence.

On January 12, 2012, Steve Cook was arrested for felony theft of property for stealing approximately $7000 worth of jewelry from Jana Wineland. Also, a petition to revoke his suspended sentence was filed based on the facts of his arrest.

On March 14, 2012, the defendant's wife Stefany Cook, went to the Benton Police Department and initially told them that she was the person that committed the theft. When she was pushed on the truth of her statement, she broke down and said that Steven had told her to claim responsibility for the crime because she did not have a record and would be given probation.

On June 25, 2012, Stefany Cook came to the prosecutor's office and expressed her fear of the Defendant. Stated that he had threatened to "take her down" if she did not testify the way he wanted her to. She was afraid that he would cause her physical harm. Based on her statements, an Amended Petition for Revocation of Suspended Sentence was filed. An order was signed by a judge issuing a warrant for Steven Cook with a $25000 sheriffs bond.

He was arrested on Friday the 29 and I was told by Stefany Cook that he had pushed his colon out and was asking to be released. I had previously known of his condition and that it was a long term issue and not something he sought emergency treatment for. I confirmed this with Mrs. Cook who stated that this occurred every time he used the bathroom and that he can put it back in.

I called the jail and was told that the Sheriff had said to release him due to his condition. I called the Sheriff and explained that it was my understanding that this is a long term condition that the defendant can manipulate to get released. I also told him that I had concerns about the safety of the victim in the case. He thanked me for the information but told me that if the jail was going to be on the hook for expensive medical treatment he was going to have him released. I told him I understood.

On Monday, July 2, Steven Cook was taken to bond hearings. Our office argued to keep him in. His bond was reduced to a signature bond on the condition he seek medical treatment. It is my understanding that he went to Saline Memorial Hospital. His wife stated that she received a call from hospital but did not answer it because she believed it was the defendant trying to contact her. She received several more calls that day that she did not answer because she believed that they were calls from the defendant from several locations.

Also, on July 2, Stefany Cook petitioned the Circuit Court to grant her an Order of Protection against Steven Cook and it was granted.

It is my understanding that Mr. Cook has been contacting news organizations and telling people that he is going to sue the county.

GILL1        7/3/12  12:08 pm

Also, at the end of one of Mr. Cooks interviews with Benton Police while they were investigating the theft case, he stated that he had recently won $50,000 on a scratch off lottery ticket. This was untrue and seemed to be a lie for the sake of lying.

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK,

      Plaintiff,

Vs.                  Case No. 4:15CV228-BRW

BRUCE PENNINGTON, Individually, and in his official
capacity as Sheriff of Saline County, Arkansas; LT. DON
BIRDSONG, Individually, and in his official capacity as
the Administrator of the Saline County Detention Center;
ROGER L. TROXEL, M.D., Individually, and in his official
capacity as a policy-maker and health care provider for
Advanced Correctional Healthcare, Inc.; ANDY GILL,
Individually; ADVANCED CORRECTIONAL HEALTHCARE, INC.;
SALINE COUNTY, ARKANSAS; DEPUTY LAUREN FURR,
Individually; SGT (1st name unknown) RICHARDS,
Individually; DEPUTY RYAN MCKINNEY, Individually; and
LPN GLENN SONK, Individually,

      Defendants.

THE VIDEOTAPED DEPOSITION OF ROGER TROXEL, M.D.
December 18, 2015

EXHIBIT _E_

ACP REPORTING, INC.
Certified in Tennessee and Arkansas
1615 North Division Street
Forrest City, AR 72335
(870)295-1235
annereporter@aol.com

Page 12

1    Q.    Okay.  You were in what we call medical?

2    A.    Yes.

3    Q.    Where is that in relation to the booking area?

4    A.    I am not aware of where the actual booking area

5    is.  I do know that Mr. Cook -- I'm sorry -- was in an

6    area that appeared to be a cell with a toilet, and I

7    recall two or three other gentlemen in this cell with

8    him.

9    Q.    Okay.  I guess that leads to my next question

10   then.  Did you -- regardless of whether you had left

11   the building or not, did you go to the cell in which

12   Mr. Cook was placed and observe the prolapsed colon?

13   A.    Yes, I did.

14   Q.    Okay.  Do you know who was there with you to

15   observe the prolapsed colon?

16   A.    It was really, I guess, immaterial at the time

17   who the other players were.  So I don't recall exactly

18   who was in the room.  I do know that I was in the room

19   and that Mr. Cook was in the room.

20   Q.    Okay.  You were focused on the patient, and at

21   this point, you don't recall who else might have been

22   there?

23   A.    Yes.

24   Q.    If Mr. or Nurse Sonk indicates in his medical

25   progress note that he went with you and Deputy Furr to

Page 13

1   the cell where Mr. Cook was being kept, you would not

2   have any reason to doubt that, would you?

3   A.    Not at all.

4   Q.    Okay.  Do you -- what did you do or -- strike

5   that.

6         Did you observe the rectal prolapse?

7   A.    Yes.

8   Q.    Approximately how much of the rectum was

9   prolapsed?

10  A.    The rectum prolapse was approximately the size of

11  my hands.

12  Q.    You're holding both of your hands out.

13  A.    It appeared to be as it was in the shape almost

14  of a bowl.  So I would say bigger than an ice cream

15  bowl, probably the size of a cereal bowl in your

16  kitchen.

17  Q.    Okay.

18  A.    It essentially is going to come out in almost

19  layers, kind of like ice cream.  It was not -- in other

20  words, the rectum was not that wide.  It just sort

21  of -- well, it's called redundant anatomy.  So it was

22  just basically a mass of tissue about that size, about

23  the size of a bowl.

24  Q.    Okay.  You were holding your hands together when

25  you did that, and when I look at my hands together like

Cook v. Pennington, Et Al                          Roger Troxel MD

Page 14

1    that, it would appear that the prolapse was a good six

2    to seven inches wide.  Would that be true?

3    A.    Yes.

4    Q.    Okay.  And I am assuming that the more of the

5    rectum that actually protrudes, the larger the prolapse

6    will get -- would that be true -- at least up to a

7    point?

8    A.    That would depend upon the clinical situation

9    because there are other things that would limit how

10   much of the inside can actually go outside.  Most cases

11   of rectal prolapse are chronic conditions where the

12   patient can prolapse it and reinsert it.

13   Q.    Okay.

14   A.    And there are limiting factors like the anatomy

15   itself.

16   Q.    Okay.  Now, we have established that it was six

17   to seven inches wide.

18   A.    Yes.

19   Q.    How far from the anus was the tip of the

20   prolapse?  How far had it come outside the body as best

21   you can recall?

22   A.    The best way I could describe this, it's like

23   taking off your sock, and so when you take off your

24   sock and it is in kind of a wad on the floor, you

25   really don't know where the toe is or really don't know

Page 15

1    where the part that your foot goes in is.  So it would

2    be difficult to determine.

3         I am assuming that the anal opening was outside

4    the body somewhere in that six- to seven-inch wide mass

5    of tissue.

6    Q.    Okay.  We know it was six to seven inches wide.

7    Would it have been at least maybe two to four inches

8    outside the body?

9    A.    Three inches most likely, two to three inches.

10   Q.    Okay.  What did it look like?  And the reason I

11   ask is I need to know how reasonable or unreasonable my

12   client's reaction to it was.  So what did it look like?

13   A.    The rectum is a very vascular area, and so there

14   were obvious blood vessel appearances.  It honestly

15   appeared to look -- nonbleeding hamburger meat would be

16   about the best way to describe it.  It wasn't horrid.

17   There was no stool.  There was no -- so there was no

18   feces.  There was no pus, mucus, things of that nature.

19   Q.    Was there any blood?

20   A.    Visible blood on the outside, no.

21   Q.    Would you expect there to be some blood that

22   would excrete from the anus as a result of a prolapse

23   of this nature?

24   A.    Again, that would depend upon the clinical

25   circumstances, but the rectum is a very vascular area.

SUPPLEMENTAL AFFIDAVIT OF
BRUCE PENNINGTON

Bruce Pennington, having been sworn, deposes and states:

I am one of the defendants in *Cook v. Pennington,* et al., pending in United States District Court. I have given my deposition. In my deposition, I stated that I was advised that Mr. Cook could manipulate his colon to cause a prolapse, and that there was concern on the part of Andy Gill, Deputy Prosecuting Attorney, for the safety of the victim, if released. Because of Mr. Cook's criminal record, I elected to keep him in the jail over the weekend so that Judge Robinson could hear evidence prior to Cook's release. Mr. Cook is an extremely violent individual. With a warning from the prosecutor's office that he might harm the victim, I could not in good conscience release Mr. Cook.

I have reviewed Exhibit 3 to Andy Gill's deposition. It accurately reflects the information that was conveyed to me, although I am still not certain whether the transmittal of the information was directly from Mr. Gill (as he remembers it) or through Don Birdsong.

Although I may have told Mr. Gill that I was considering Mr. Cook's release, I did change my mind. My decision was based on the information conveyed to me about Mr. Cook's condition, his voluntary ability to manipulate the prolapse,., and Mr. Gill's concern for the safety of the victim.

Dated this _9th_ day of January, 2016.

_____
BRUCE PENNINGTON

STATE OF ARKANSAS        )
                         )SS.
COUNTY OF SALINE         )
    Subscribe and sworn to before me on this _9th_ day of January, 2016.

RHONDA MALONE
MY COMMISSION # 12389493
EXPIRES: October 4, 2022
Saline County

_____
NOTARY PUBLIC

EXHIBIT E

Steven David Cook v. Bruce Pennington, et al.

Page 1

# IN THE UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF ARKANSAS
### WESTERN DIVISION

| | |
|---|---|
| STEVEN DAVID COOK | ) Plaintiffs |
| | ) |
| VS. | ) No. 4:15 CV 228-BRW |
| | ) |
| BRUCE PENNINGTON; | ) |
| LIEUTENANT DON BIRDSONG; | ) |
| ROGER L. TROXEL, M.D.; | ) |
| ANDY GILL; ADVANCED | ) |
| CORRECTIONAL HEALTHCARE, | ) |
| INC.; SALINE COUNTY, | ) |
| ARKANSAS; DEPUTY LAUREN | ) |
| FURR; SERGEANT RICHARDS; | ) |
| DEPUTY RYAN McKINNEY; and | ) Defendants. |
| GLENN SONK, LPN | |

-----------------------------------

ORAL DEPOSITION OF

RYAN McKINNEY

DECEMBER 14, 2015

-----------------------------------

ORAL DEPOSITION OF RYAN McKINNEY, produced as a

witness at the instance of the Plaintiff, and duly

sworn, was taken in the above-styled and numbered cause

on December 14, 2015, from 2:42 p.m. to 3:18 p.m.,

before Crystal Garrison, Certified Court Reporter, in

and for the State of Arkansas, reported by machine

shorthand, at the offices of Ellis Law Firm, 126 North

Main Street, Benton, Arkansas 72015, pursuant to the

Federal Rules of Civil Procedure.

EXHIBIT 6

Page 21

1   up a report of that day; therefore, I wrote this report.

2   Q.   Okay.  When did -- Birdsong asked you to do a report

3   of what you said that day.  You mean of June 29th

4   regarding Inmate Cook?

5   A.   Lieutenant Birdsong asked me on July 6th, if I would

6   do a comprehensive brief report of the whole situation.

7   Q.   Okay.  Regarding --

8   A.   From the time --

9   Q.   -- Inmate Cook?

10  A.   Yes.

11  Q.   Okay.  Do you know why he needed that report?

12  A.   Lieutenant Birdsong liked reports on everything from

13  the smallest thing to the biggest thing.  And --

14  Q.   Okay.

15  A.   -- so.  And I was fairly good at writing reports;

16  therefore, he asked me.

17  Q.   Okay.  Did you ever -- did you have any idea on June

18  29th what was -- what medical issue Steven Cook had in

19  the jail?

20  A.   Could you elaborate and be more specific about

21  what --

22  Q.   Did you know what was wrong with him?

23  A.   No, sir.

24  Q.   Okay.  Okay.  Is it true that all you know is that

25  you heard Dr. Troxel explain to the jail administration

Ryan McKinney 12/14/2015                    Steven David Cook v. Bruce Pennington, et al.

Page 22

1    that "we really needed to have Inmate Cook released"?

2    A.   Yes, sir.

3    Q.   Is that all you knew?

4    A.   Yes, sir.

5    Q.   Did you -- you didn't have any idea what was wrong

6    with him?

7    A.   Without some grotesque, and with all respect, I

8    was -- I overheard one of them say, "There's something

9    wrong with his butt hole."

10   Q.   Okay.  His rectum?

11   A.   Or rectum.

12   Q.   Okay.  And what exactly did you overhear, just that

13   there was something wrong --

14   A.   Yes --

15   Q.   -- with him?

16   A.   Yes, sir.  No details.

17   Q.   Okay.  Okay.  Do you know if anyone went down to the

18   cell and actually looked to see what was wrong with

19   Steven Cook?

20   A.   I know someone did, I cannot tell you who it was,

21   though.

22   Q.   Okay.

23   A.   Because I do not know.

24   Q.   Okay.  What was ordinarily the process or the

25   practice in the jail if an inmate needed to go to the

Page 23

1   hospital?  How did you guys go about meeting that

2   medical need?

3   A.    Our transport officer -- officers would take them to

4   the hospital.

5   Q.    Okay.  And who made the decision, generally, to

6   release someone to go to the hospital?

7   A.    The --

8   Q.    Or to send them to the hospital?

9   A.    The Lieutenant.  Or if the Lieutenant was not

10  available, Sergeant Lester, who was in charge of

11  transport.

12  Q.    Okay.  Did you have any authority or responsibility

13  with regard to that decision?

14  A.    No, sir.

15  Q.    Okay.  Do you know what authority Dr. Troxel had?

16  A.    I'm somewhat familiar with the authority Dr. Troxel

17  has.

18  Q.    What was the authority -- to your knowledge, what

19  authority did Dr. Troxel have?

20  A.    If Dr. Troxel said someone absolutely must go to the

21  hospital, we would take them to the hospital.

22  Q.    Okay.  And if Dr. Troxel said they needed to go to

23  the hospital, that was pretty much the last word; is

24  that what you're telling us?

25       MR. JACKSON:  Object to form.



# Saline County Sheriff's Office
## BRUCE PENNINGTON - *Sheriff*



July 6, 2012

To: Advanced Correctional Healthcare
Cc: Jail Administration
Re: The release of Inmate Cook
From: Dep Ryan McKinney


On Friday, June 29th, 2012, I was in the Sergeants office when I heard Dr. Troxel explain to the jail administration that we really needed to have inmate Cook released, do to his medical condition. Immediately, under advisement of Dr. Troxel, LT Birdsong got in contact with Sheriff Pennington, who agreed to release inmate Cook on a signature bond. The booking officers then were notified to release him.

Shortly thereafter, I was in the booking area when Dep Crystal McKinney received a call from Saline County Prosecutor, Andy Gill. The phone was on speakerphone, so I overheard the call. Mr. Gill stated that inmate Cook could push his rectum inside out, "at will", and that we were NOT to release him.

LT Birdsong and the Sheriff were notified of the call from Mr. Gill and what he said. Inmate Cook was not released over the weekend, but on Monday morning, July 2nd, the Judge changed his bond to a signature bond, and inmate Cook was immediately released, with instructions to go directly to the ER.


Dep. Ryan McKinney
#832
Administrative Assistant to the Jail Administrator



EXHIBIT
1

Page 1

IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF ARKANSAS
WESTERN DIVISION

STEVEN DAVID COOK                ) Plaintiffs
                                 )
VS.                              ) No. 4:15 CV 228-BRW
                                 )
BRUCE PENNINGTON;                )
LIEUTENANT DON BIRDSONG;         )
ROGER L. TROXEL, M.D.;           )
ANDY GILL; ADVANCED              )
CORRECTIONAL HEALTHCARE,         )
INC.; SALINE COUNTY,             )
ARKANSAS; DEPUTY LAUREN          )
FURR; SERGEANT RICHARDS;         )
DEPUTY RYAN McKINNEY; and        )
GLENN SONK, LPN                  ) Defendants.

---------------------------------------

ORAL DEPOSITION OF

MIKE RICHARDS

DECEMBER 14, 2015

---------------------------------------

    ORAL DEPOSITION OF MIKE RICHARDS, produced as a
witness at the instance of the Plaintiff, and duly
sworn, was taken in the above-styled and numbered cause
on December 14, 2015, from 9:14 a.m. to 10:09 a.m.,
before Crystal Garrison, Certified Court Reporter, in
and for the State of Arkansas, reported by machine
shorthand, at the offices of Ellis Law Firm, 126 North
Main Street, Benton, Arkansas 72015, pursuant to the
Federal Rules of Civil Procedure.

EXHIBIT H

Mike Richards 12/14/2015                    Steven David Cook v. Bruce Pennington, et al.

Page 24

1   Q.    Okay.  We'll talk about Officer McKinney's statement

2   in just a minute.  But why don't you tell me what you

3   recall the chronology of events on that day.

4   A.    The first I heard of the situation, I was in the

5   office, Lieutenant Birdsong was in the office, there

6   were a couple of other people there, I don't know.  We

7   was quitting time on a Friday.  I don't know.

8         Lieutenant Birdsong was seated at my desk, I was

9   seated at a blank chair, and someone was seated --

10  someone else -- no, Sergeant -- Lieutenant Birdsong was

11  seated at the other sergeant's desk.  And somebody was

12  seated at my desk.  And I was just sitting in a chair.

13  Q.    Okay.  Were you a sergeant at --

14  A.    Yes.

15  Q.    -- that point?  Tell me what happened in as much

16  detail as you can recall.

17  A.    Lieutenant Troxel came in the doorway -- I don't

18  remember --

19  Q.    Lieutenant Troxel or Dr.?

20  A.    I mean, Dr. Troxel.

21  Q.    Okay.

22  A.    I don't remember Ms. Furr at all.

23  Q.    Okay.

24  A.    Dr. Troxel came in the doorway and said -- how

25  specific do I need to be?

Page 25

1   Q.   She's heard it all.  Just go ahead and be as

2   specific as you want to.

3   A.   Said:  You're not going to believe this shit.  I've

4   seen something I've never seen before.

5   Q.   Okay.

6   A.   I remember the statement.

7   Q.   Okay.

8   A.   And Lieutenant Birdsong said:  "Well, it must be

9   pretty bad, you being a doctor."  And he said:  "I got

10  some guy's got his ass hanging out."

11  Q.   Okay.  So, he said:  "I've got some guy --

12  A.   "That has his ass hanging out."

13  Q.   "That has his ass hanging out"?

14  A.   That's exactly what he said.

15  Q.   Okay.

16  A.   Or real -- pretty close.

17  Q.   Okay.  And what was said next and by whom?

18  A.   He asked Lieutenant Birdsong if he wanted to come

19  see it.  Birdsong said:  "I've never seen anything like

20  that."  And he said:  "Well, you need to come out here

21  and look at this."

22  Q.   Okay.

23  A.   And Birdsong said, "No, I don't need to see that."

24  Q.   Okay.

25  A.   He asked Lieutenant -- I mean, he asked Dr. Troxel:

Page 26

1    "What do we need to do about it?"  Dr. Troxel said,

2    "Well, I think he needs to get out of here."

3    Q.    Okay.  "I think he needs to get out of here."  Okay.

4    A.    I don't remember the exact words, but that's pretty

5    close.  He didn't say he needed to go to the hospital.

6    He said we needed to release him.  I think that -- I

7    think is how the conversation went.

8    Q.    "We need --

9    A.    I wasn't involved in the conversation.

10   Q.    -- to release him."

11   A.    "Need to let him go.  Get him out of here."

12   Q.    "Let him go.  Get him out of here."  Something along

13   those lines?

14   A.    Yes.

15   Q.    Okay.  So, what happened next?

16   A.    If I remember right -- I don't remember all the

17   details, but -- it's been a long time ago.

18   Q.    Yeah.

19   A.    If I remember -- what I can remember, I think

20   Lieutenant Birdsong got on the phone and called Sheriff

21   Pennington.

22   Q.    Okay.  And what happened after that?  Oh, did you

23   hear the --

24   A.    No.

25   Q.    Lieutenant Birdsong's side of the conversation with

Page 27

1    Sheriff Pennington?

2    A.    Just Lieutenant Birdsong's side.

3    Q.    Okay.  That's -- you did hear Lieutenant Birdsong's

4    side.  What did Lieutenant Birdsong tell Sheriff

5    Pennington?

6    A.    I think he repeated the statement that Dr. Troxel

7    had made when he came to the door.

8    Q.    Okay.  Okay.  Did he identify the inmate?

9    A.    I don't think -- I don't recall ever hearing his

10   name.  I don't recall -- remember doing that.  I don't

11   recall Dr. Troxel saying it or -- well, Pennington

12   wouldn't have known -- I mean, Birdsong wouldn't have

13   known because I don't think Troxel ever said the name.

14   Q.    Okay.

15   A.    That I remember.

16   Q.    That you remember.  Okay.  What happened next?

17   A.    Birdsong hung up the phone and said:  Well, I guess

18   we're going to let him go.

19   Q.    Okay.  And what happened after that?

20   A.    Someone came to the door -- the process was started.

21   I think -- I think at that time, Mr. McKinney -- Deputy

22   McKinney was the administrative assistant to the jail

23   administrator.  And I think he was there -- I think he's

24   the one that left and went to booking to get the process

25   started to let him go.

Page 28

1   Q.    Okay.  So, McKinney went to start the process to let

2   him go; as best --

3   A.    I think.

4   Q.    -- you recall?  Okay.

5   A.    I think it was McKinney.

6   Q.    And was he subsequently released?

7   A.    No.

8   Q.    What happened that caused him not to be released

9   after Pennington had told Birdsong to release him?

10  A.    We received word from the booking area that a call

11  had been received from a -- from the prosecuting

12  attorney's office saying that this person had the

13  ability to do it at will.  He had done it at two other

14  jails and we were not to let him go under any

15  circumstances.

16  Q.    Okay.  So your understanding was that a prosecutor

17  -- do you know which prosecutor it was?

18  A.    I didn't at the time.  I do now.

19  Q.    Do you -- well, who was it?

20  A.    Andy Gill.

21  Q.    Okay.  Your understanding is that Andy Gill said

22  that the inmate at issue had done this at two other

23  jails --

24  A.    Correct.

25  Q.    -- and that we were not -- you were not to let him

Page 29

1    go?

2    A.    That was my understanding.  I didn't hear all of it.

3    Q.    I understand.

4    A.    I wasn't involved in the decision making process.  I

5    really wasn't involved in the situation.  I just

6    happened to be there when Dr. Troxel came in.

7    Q.    Okay.

8    A.    I don't remember very much about it because I left.

9    So, I --

10   Q.    Okay.

11   A.    In the meantime.

12   Q.    Oh, after you heard Troxel tell Lieutenant Birdsong

13   that:  I've got some guy that has his ass hanging out.

14   And then you heard Lieutenant Birdsong's side of the

15   conversation with the sheriff and Birdsong say:  I guess

16   we're going to let him go.  At some point, shortly after

17   that, you left and went on about your business; would

18   that be correct?

19   A.    I was there long enough to hear the part about the

20   prosecuting attorney's office saying --

21   Q.    Okay.

22   A.    -- don't let him go.

23   Q.    Don't let him go.

24   A.    Uh-huh.

25   Q.    And who -- who told Birdsong that the prosecutor's

Page 30

1   office said not to let him go?

2   A.    I think it was Crystal McKinney.  I can't remember

3   for sure.  But I think it was Crystal McKinney.

4   Q.    Crystal McKinney?  What about --

5   A.    Or Crystal Drennen (phonetic.)

6   Q.    Okay.  What about Ryan McKinney, was he a part of

7   that?

8   A.    He had gone out there.  He could have been.

9   Q.    Okay.

10  A.    He could have been part of that.

11  Q.    Someone, probably either Crystal McKinney or Deputy

12  Ryan -- excuse me.  Crystal McKinney and Deputy Ryan

13  McKinney, one of those two told Birdsong that Gill had

14  said not to let him go?

15  A.    Correct.

16  Q.    Okay.  Does Gill have the authority to determine --

17  does Gill have the authority to run the jail?

18  A.    No.

19  Q.    If Gill testified that all he did was request that

20  the inmate not be released, would you have any personal

21  knowledge to contradict that?

22  A.    No.

23  Q.    Okay.

24  A.    I didn't speak to him.

25  Q.    You didn't speak to him.  All you know is what you

Page 31

1   heard from either Crystal McKinney or Ryan McKinney,

2   right?

3   A.   It might have been both that came to the office.  I

4   don't know.  They might have came together.

5   Q.   Okay.  Are they -- are they married or just happen

6   to have the same last name?

7   A.   They were at the time.

8   Q.   They were at the time.

9   A.   Or right -- or pretty close.

10  Q.   Okay.

11  A.   They were pretty close.  I think they got married in

12  June.

13  Q.   Okay.  All right.  Let's go back to defendant's

14  Exhibit 1 in front of you there.

15  A.   Uh-huh.

16  Q.   We've looked at the first paragraph.  It says --

17  Lauren Furr says that Troxel, Mr. Sonk and I went to the

18  booking area.  Troxel entered holding cell 1, he spoke

19  with Inmate Cook for a few moments and then left the

20  cell.  Troxel stated to me once the holding door was

21  shut that Inmate Cook had a prolapsed rectum and we

22  needed to get him out of here.

23       Do you have any personal knowledge about anything

24  that's related to us in that second paragraph of Exhibit

25  No. 1?

Page 32

1    A.    No.

2    Q.    Okay.  All you know is what you heard when Troxel

3    came to the office where you and Birdsong were sitting;

4    is that right?

5    A.    That's correct.

6    Q.    Okay.  "Dr. Troxel then stated that we need to talk

7    to the administration about getting Cook out of the

8    facility.  I escorted Dr. Troxel to Sergeant Richards

9    office.  Dr. Troxel informed Sergeant Richards,

10   Lieutenant Birdsong and Sheriff Pennington of the

11   situation."

12         Is that a correct statement or an incorrect

13   statement?

14   A.    I don't recall Furr being there.  I just know Dr.

15   Troxel walked into the doorway of the office and said

16   what I said awhile ago.

17   Q.    Okay.  And that was:  I've got somebody that has his

18   ass hanging out and, basically, we need to release him?

19   A.    We need to get him out of here.

20   Q.    We need to get him out of here.

21   A.    Uh-huh.

22   Q.    If Andy Gill did not have the authority to run the

23   jail, do you know why Inmate Cook was not released that

24   day?

25   A.    I do now.  I didn't then.

Page 33

1    Q.    What is the reason that you believe now?

2    A.    Lieutenant Pennington -- I mean, Lieutenant Birdsong

3    was notified of the call from Andy Gill.  He left the

4    office.  He went to the sheriff's office.  He was gone

5    ten minutes, he came back and said:  We're not going to

6    release him.

7    Q.    Okay.  So --

8    A.    Per the prosecutor.

9    Q.    So, Birdsong went to Pennington's office and when he

10   came back, he said:  We're not going to release him, per

11   the prosecutor?

12   A.    Correct.

13   Q.    Okay.  Of your own personal knowledge, you do not

14   know what was said between Birdsong and Pennington; is

15   that correct?

16   A.    He never relayed it to me.

17   Q.    Never?

18   A.    No.

19   Q.    Did you ever talk with Sheriff Pennington about it?

20   A.    No.

21   Q.    So, you -- not only do you not have any direct

22   knowledge, you don't have any hearsay knowledge of

23   exactly what was said in that conversation; would that

24   be true?

25   A.    That would be correct.

Mike Richards 12/14/2015                    Steven David Cook v. Bruce Pennington, et al.

Page 34

1    Q.    Okay.  And someone outranking you, who was the

2    ranking officer there that day, said:  We're not going

3    to let him out.  And that was it, that was the final

4    decision as far as you were concerned?

5    A.    That's correct.

6    Q.    Okay.  Because you can't overrule the lieutenant?

7    A.    No.

8    Q.    Just like the corporal can't overrule you?

9    A.    No.

10   Q.    Okay.  And then, looking at the very last sentence

11   of Exhibit No. 1, it says:  Sheriff Pennington stated

12   that Inmate Cook was to be booked and released per him.

13   Is that true or false?

14   A.    That's not correct.

15   Q.    Okay.  Did Sheriff Pennington ever say that Cook was

16   to be released?

17   A.    To my knowledge, Sheriff Pennington never spoke to

18   Ms. Furr.  She's put a statement down here that she had

19   no direct knowledge of.

20   Q.    Okay.  So your belief is that -- especially with

21   regard to the third and fourth paragraphs of Defense

22   Exhibit 1, Lauren Furr had no direct knowledge, as far

23   as you know, and you wonder about her credibility?

24   A.    No. You asked two different questions --

25         MR. ELLIS:  No.  Wait a minute.  I object to the

Page 35

1    form of the question.

2          MR. ADCOCK:  Okay.  I understand.  I would have

3    object, too.  I'll withdraw it.

4          MR. ELLIS:  That's not what he said.  Okay.

5          MR. ADCOCK:  I'll withdraw it.

6    Q.   (BY MR. ADCOCK)  To your knowledge, Deputy Lauren

7    Furr had no direct knowledge of the facts set forth in

8    the third and fourth paragraphs, down from the top of

9    this exhibit; would that be true?

10   A.   She had no direct knowledge of Sheriff Pennington's

11   response.

12   Q.   Okay.  Do you know if she was present when Troxel

13   spoke to Cook in the -- what is it -- holding cell No.

14   1?

15   A.   I do not know.

16   Q.   Okay.  Did you ever actually observe the prolapsed

17   colon that Cook was experiencing?

18   A.   No.

19   Q.   Okay.  Do you know who did?

20   A.   No.

21   Q.   Okay.

22   A.   Dr. Troxel, I assume.  He stated he did.

23   Q.   Okay.  Do you have any direct knowledge of the call

24   that came from Gill to the booking area where Deputy

25   Crystal McKinney was?

Page 36

1   A.   No.

2   Q.   Okay.  You never heard Gill say anything about this?

3   Everything you know about what Gill may have said is

4   hearsay to you; would that be correct?

5   A.   I don't remember ever hearing anything from Gill.

6   Q.   Okay.

7   A.   Not directly.

8   Q.   Were you on duty three days later on Monday, July

9   2nd?

10  A.   I assume.

11  Q.   Do you know why Cook was released that day?

12  A.   I don't have any direct knowledge -- I don't

13  remember.  I just know he was let go.  That's all I

14  remember.

15  Q.   Well, you don't have any direct knowledge.  Did --

16  have you talked with anybody about Cook being released

17  on Monday?

18  A.   No.

19  Q.   Nobody at all?

20  A.   Not that I can remember.

21  Q.   Okay.  Do you have any knowledge about why Cook was

22  released --

23  A.   No.

24  Q.   -- on Monday?  Hearsay or direct knowledge?

25  A.   No.